Filed 3/5/18

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                 )

          )

      Plaintiff and Respondent,    )

          )         S097558

      v.                   )

          )

TODD JESSE GARTON,        )

          )       Shasta County

      Defendant and Appellant.    )    Super. Ct. No. 98F4493

_____)

A jury in Shasta County convicted defendant Todd Jesse Garton of first degree murder and conspiracy to murder his wife, Carole Garton, and her fetus, and conspiracy to murder his codefendant's husband, Dean Noyes. (Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a); all undesignated references are to this code.) The jury found true special circumstance allegations that defendant committed multiple murders, that he committed the murders for financial gain, and that a principal in each offense was armed with a firearm. (§§ 190.2, subds. (a)(3), (a)(1), 12022, subd. (a)(1).) The jury returned a verdict of death. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) We reverse defendant's conviction for conspiracy to murder Dean Noyes and affirm the judgment in all other respects.

SEE CONCURRING AND DISSENTING OPINION

# I. FACTS

## A. Guilt phase

Defendant was originally charged with a codefendant, Lynn Noyes. Before trial, the court severed their cases, and Lynn Noyes pleaded guilty to the murder of Carole Garton and to the conspiracy to murder her husband, Dean Noyes. For clarity, we refer to Carole Garton, Lynn Noyes, and Dean Noyes by their first names. The parties presented the following evidence in Garton's trial.

### 1. Prosecution evidence

Garton and Lynn met in high school in 1986 and dated for a time. After Lynn was suspended from high school, she saw Garton less, and by 1987, Garton had begun dating Carole. In 1990, Garton entered the Marine Corps, and he and Carole married in 1991. Although Lynn and Garton remained in contact, Lynn began dating Dean, and the two were married in 1992. Lynn and Dean had divorced by the time of Garton's trial in 2001.

### a. Conspiracy to kill Dean Noyes

In the beginning of 1996 or 1997, after he and Carole had moved to Shasta County, Garton told his friend Dale Gordon that he was a paid assassin for an organization he called "The Company." He began to talk about murdering Lynn's husband, Dean, as a "hit" or "assassination" for this organization in exchange for money. Over the course of one or two years, Garton and Gordon discussed the murder "about 50 times, at least," and "[m]aybe a hundred times." Garton said he would be paid $25,000 for such a murder, and although he did not agree to a particular amount, Garton told Gordon that Gordon would be paid from Dean's life insurance policy if he was involved in his murder. Gordon agreed to help plan and participate in Dean's murder.

2

In the spring of 1997, Garton told Lynn that Dean was having an affair and that "he knew people who could take him out." Later that year, Lynn received a call from the husband of the woman with whom Dean was having an affair. When she confronted Dean, he acknowledged the affair. Lynn then told Garton to "go ahead and take him out." She told Garton that Dean would be taking a trip to San Francisco in the future, and she sent Garton a box with keys to the cars that she and Dean owned; keys to their home in Gresham, Oregon; pictures of Dean; and information about where he parked and typically went after work in Portland, Oregon.

Garton began discussing a plan to murder Dean with another friend, Norman Daniels, around October 1997. Garton said there were several "contracts on [Dean's] head" because he had embezzled money, and Daniels agreed to accompany Garton and Gordon and provide "support" for the plan. Garton told Daniels that he would receive $1,000 after Lynn received Dean's life insurance payment if Daniels participated.

Garton originally planned to kill Dean in San Francisco while he was attending a conference, and he discussed this plan with Gordon and Daniels. But the trip was cancelled, and the three never followed through on the plan.

Instead, Garton and Gordon began planning to murder Dean in Oregon at his home or workplace. The two told Daniels that they would travel to Portland in October 1997 "to scout out the area," and on October 10, 1997, Garton and Gordon rented rooms in a hotel in Portland. That afternoon, they went to the Noyeses' home in Gresham and walked through the house while she was there. Garton drew a picture of the house, and later Garton and Gordon drove by Dean's workplace in downtown Portland. That night, Lynn and Garton had sex in Garton's hotel room.

Gordon and Garton returned to Oregon on January 3, 1998. They stayed in a hotel in the Eugene area, where they met with Lynn. They talked with Lynn about killing Dean and showed her several guns and knives, as well as ammunition, additional magazines, handcuffs, latex gloves, and a first aid kit. Gordon said they did so "to show Lynn that we were really going to do this." Lynn spent the night in Garton's room; the two had sex and returned to their respective homes the following day.

In late January or early February 1998, Garton, Gordon, and Daniels met at the Moose Lodge in Anderson, California, to plan a trip to Oregon to murder Dean. They discussed two plans: first, they would try to kill Dean at his workplace; failing that, they would enter the Noyes residence and shoot him there. Garton also discussed paying Gordon and Daniels for their roles in the killing.

On February 6, 1998, the three men drove up to Oregon. They brought a variety of guns, a silencer, communication devices, handcuffs, and latex gloves. Upon arriving in Gresham, they checked into a motel and stashed their equipment in their room. They then drove to the parking garage near Dean's workplace, where they planned to kill him the next day.

The next morning, Garton, Gordon, and Daniels rose early and drove to the parking garage to await Dean's arrival. But Dean never arrived; unbeknownst to Garton, Lynn had told Dean to drive the larger of their cars, knowing that this car would not fit into the garage where the three men waited. After realizing that Dean had parked elsewhere, the men left and checked into a different hotel. Later, Garton shot a rifle out the hotel window into a deserted field.

That afternoon, Lynn came to the hotel. She tried to convince Garton to abandon the plan, but he insisted that it was too late to do so and that he would try to kill Dean again that evening. She later called Garton and said she would try to

4

get Dean and his brother, who was visiting at the time, out of the house so that the killing would not occur in her home.

That night, Garton, Gordon, and Daniels left the hotel and parked near the Noyes residence. The men, all armed, approached the house, and Garton went to the front door. But Garton was unable to open the door, and the men ran back to their car. They returned to their hotel and departed for California the next morning.

After returning home, Garton concocted a new plan to kill Dean. At the time, Lynn thought Dean was embezzling money from his employer. Garton planned to use this information to extort Dean and then kill him. He returned to Gresham in May 1998 and, with Lynn's assistance, staged a break-in of the Noyes residence, taking a planner, a laptop, and some computer disks and equipment. According to Daniels, Garton also planned to kill Dean on this trip if the opportunity arose. Following the staged break-in, Garton called Daniels from his hotel room, telling him to send Dean an anonymous e-mail insinuating that someone knew he was embezzling and threatening harm to his children if he didn't cooperate. Daniels complied. Subsequently, Dean received several cryptic messages from the same anonymous e-mail address. Garton's computer contained evidence that he had accessed the account from which these e-mails were sent. Garton continued to discuss the possibility of murdering Dean with Lynn after sending these e-mails and after Carole's murder, but the conspiracy to murder Dean was never carried out.

### b. *Murder of Carole Garton and her fetus*

In October 1997, Carole and Garton discovered that Carole was pregnant. The prosecution presented evidence that Garton thought children were "pains"

5

who would take away his freedom. He told people that he did not want the child and that it was not his.

A few months later, Garton and Carole applied for life insurance. Carole was approved for a policy of $125,000, which was in effect at the time she was murdered. Garton was listed as the primary beneficiary.

In early April 1998, two months after Garton, Daniels, and Gordon had driven to Oregon to murder Dean, Garton approached Daniels about another killing. He explained his involvement in The Company and said the organization would pay Daniels for fulfilling one of its "contracts" to kill someone. After completing one assassination, Daniels would become a member of The Company. If Daniels agreed to do this, Garton explained, The Company would send him a package revealing Daniels's target. Garton's code name was "Patriot," and he gave Daniels a business card that said "Patriot" and had Garton's pager number on it.

Later that month, in preparation for the killing, Daniels and Garton bought a handgun, cleaning equipment, a holster, and two boxes of ammunition. Garton advised Daniels what gun to buy, paid for it, gave Daniels a holster for it, and helped him break it in. Daniels used that gun to kill Carole.

On April 27, 1998, Garton bought a label maker, label tape cartridges, a manila envelope, and a pager. That night, he delivered the "target package" to Daniels. The package was in a manila envelope with a label on it, and it bore a wax seal with an imprint resembling a trinket of Garton's. As Daniels opened the envelope, Garton told him that if he opened it, he would have to carry out the assigned killing or else be killed himself.

The package contained a pager, some photographs, and some newspaper and magazine excerpts about the Irish Republican Army (IRA). All three photographs depicted Carole, and the back of one photograph contained

information about Carole and Garton, along with a timeframe in which the murder was to take place and other instructions.

Garton looked over the package's contents with Daniels and seemed upset that the intended victim was his wife. Daniels said he couldn't carry out the murder and asked Garton to call someone to change the target; Garton picked up the phone and started dialing, but then put the phone down and said, "Well, at least it's not me." Garton explained that Carole had been a member of the IRA and had worked with The Company, but had betrayed the group and so was being targeted as retribution. Later, on Garton's advice, Daniels destroyed the photographs and documents, but kept the imprinted wax seal.

After that meeting, Garton told Daniels that Daniels should have a received an introductory e-mail from The Company. Daniels said he had probably deleted it, and Garton said he would have The Company resend it. Soon thereafter, on May 6, 1998, Daniels received the introductory e-mail from the address "companyt@usa.net." It welcomed him to the organization, informed him how he would receive coded messages, and explained that someone would be assigned to follow him and make sure he did his job. Garton responded to the e-mail on Daniels's behalf. Over the next week, Daniels exchanged a series of e-mails with companyt@usa.net regarding his assignment. One of those e-mails contained a threat on Daniels's life if he failed to kill Carole. The Company's e-mail address was registered to a physical address in Northern Ireland, and drafts of The Company's e-mails were found on the computer at the Garton residence.

As Daniels prepared to murder Carole, Garton provided assistance and advice. He initially told Daniels to kill Carole while Garton was in Oregon in early May, so that Garton would have an alibi. He told Daniels how to dispose of the murder weapon. When Daniels's request for additional money was denied by the companyt@usa.net address, Garton offered him money. Garton then advised

7

Daniels to kill Carole on May 16, 1998, because Garton would be gone all day at a gun show.

Garton also asked Lynn to help Daniels with the killing. In the fall of 1996, Garton and Lynn had previously discussed killing Carole as a way for them to reunite. This time, Garton began by saying that because of the earlier incident in Oregon, Lynn had no choice but to help The Company with one of its contracts. He later revealed that Carole was the target and that there was nothing he could do about it.

At Garton's request, Lynn often spoke with Daniels via e-mail, online chat rooms, instant messaging, and telephone in the weeks leading up to Carole's murder. Garton told Daniels that Lynn would psychologically evaluate him on behalf of The Company, which allowed Lynn to glean information from Daniels about his preparedness and then pass that information on to Garton.

On May 16, 1998, Garton and Daniels went to work at a gun show. Garton had previously recommended killing Carole that day because everyone would be at the show and killing her at home because they lived in a sparsely populated area. Carole briefly dropped by the show after a doctor's appointment, and Daniels went home with her. After the two watched a movie together, Carole went to her room and lay down. Daniels drove to return the video, went back to the house, and then shot her five times.

Daniels left the house and drove the Gartons' Jeep to a nearby parking lot, where he abandoned the vehicle; he and Garton had planned to make the murder look like it occurred during a robbery. Daniels went home and paged Garton with the message, "All done, going home." Garton called Daniels to ask whether the message was for him, and Daniels confirmed it was. Daniels then left a message for Lynn, and the two later communicated online and over the phone; she advised

8

him to dispose of any evidence. He also e-mailed companyt@usa.net with the message, "Package delivered."

Later that afternoon, Gordon's girlfriend, Sarah Mann, arrived at the Garton residence. Gordon, Daniels, Garton, Carole, and Mann had all planned to go out that evening. On her way there, Mann saw Daniels driving the Gartons' Jeep. She entered the home but saw no one there, so she watched television and played on the computer. Gordon arrived next, followed about 10 minutes later by Garton. Garton asked where Carole was, went outside, quickly came back in, and asked someone to call 911 because their Jeep had been stolen. Mann said she had just seen Daniels driving the Jeep. But Garton insisted the Jeep had been stolen and told Gordon he had to call 911.

Garton then went into the bedroom and discovered Carole's body. He yelled for someone to call 911 and attempted to resuscitate Carole. The police arrived, followed by emergency medical technicians, but they were unable to revive her. Carole was pronounced dead at the scene.

That night, Garton paged Daniels and the two spoke on the phone. Garton asked Daniels if he knew that Carole had been murdered and said the police were looking for Daniels. Garton also told him to dispose of the evidence. Daniels, who was at a friend's house, asked Garton for a ride home to get rid of the gun, but Garton refused.

The next morning, May 17, 1998, Daniels asked Lynn to have The Company protect him. Lynn told Daniels that Garton wanted Daniels to return home and dispose of the gun, though Garton warned that the house was being watched; Garton also mentioned the possibility of Daniels fleeing to New York.

On returning home, Daniels encountered two detectives who had been monitoring his home and had received information of his return, and Daniels was taken into custody. The next day, May 18, 1998, at the behest of the detectives,

9

Daniels called Garton. In that recorded conversation, after Daniels told Garton that he had "copped a plea of jealousy," Garton said, "I'm going to get on the phone to the big boys and see what we can pull here," and "I'll see whatever monies you had coming . . . goes to your kid or family or something," which Daniels understood as a reference to The Company and the money he would be paid for killing Carole.

After Daniels's arrest, Garton advised Lynn to tell the police that Daniels was jealous of Garton and Carole's relationship, that she had only ever interacted with Daniels over the internet, and that she and Garton had no romantic relationship. In June 1998, detectives came to Lynn's house. Seeing them approach from the kitchen window, she quickly called Garton, who told her to "remember the truth that [they] discussed, and stick to that."

### 2. Defense evidence

Garton testified in his defense and denied he was involved in the plot to kill Dean or in Carole's murder. He presented the following evidence through his own testimony and the testimony of several other witnesses.

### a. Conspiracy to kill Dean Noyes

Garton dated Lynn in high school and broke off the relationship when he met Carole. But the two remained in contact. When Garton informed her that he was marrying Carole, Lynn responded that she planned on marrying him and sent Carole all of Garton's letters to her in an attempt to stop the wedding. A year passed without further contact, until Lynn wrote Garton to say she too was getting married. After moving from California to Bend, Oregon, in the early 1990s, Garton and Carole reconnected with Lynn and began speaking regularly. During these conversations, Lynn repeatedly expressed romantic interest in Garton, although he discouraged such advances.

10

Carole and Garton eventually moved back to Redding, California, where Garton began working for a fencing company and a hunting equipment supplier. On weekends, he would travel to hunting equipment shows across the region; these trips often took him to Oregon. One of these trips was to Eugene, Oregon, with Gordon. He met Lynn on this trip, but the two did not have sex; according to Garton, the two never had sex in the years leading up to Carole's death. Although Lynn repeatedly told Garton about her suspicion that Dean was having an affair, Garton never provided her with any information to confirm these suspicions.

In early 1998, Garton met with Gordon and Daniels at the Moose Lodge to discuss an upcoming trip to Portland. The three did not discuss killing Dean. Instead, they discussed going to a hunting equipment show.

In February 1998, Garton, Gordon, and Daniels traveled to Portland to promote Garton's business. They brought a variety of weapons and gear for their work, but Garton shot none of the guns they brought during the trip. They spent the first night at a Quality Inn and visited downtown Portland the next morning; they did not go to the parking garage near Dean's work. They then went to the Hampton Inn, where Garton met Lynn. That evening, Daniels and Gordon took Garton's car and went to a bar near Lynn's home. The three men left the next morning.

Garton returned to Portland on May 9, 1998, accompanied by Carole. He phoned Daniels from the hotel during that visit to discuss an ongoing fencing project that was behind schedule.

### b. *Murder of Carole Garton and her fetus*

Garton presented evidence that he was loving toward Carole and excited for the impending birth of their child. Garton had been a volunteer youth soccer coach for a season and was good with kids. He attended a childbirth class with

11

Carole; although he initially admitted being there involuntarily, he became an active participant in the class. Upon learning that the child would be a boy, Garton began referring to him as Jesse and bought him a rifle.

Garton had life insurance through the United States Department of Veterans Affairs and acquired another policy through a private company in May 1998. He did not believe Carole had life insurance. He denied having any involvement in Carole's killing. He never approached Daniels about becoming a paid assassin. He never made or saw a wax seal imprinted with a trinket from his home. Although he did buy an electric label maker, it was for his mother to give to her friend.

Garton also did not buy Daniels the gun used in Carole's murder, nor did he suggest buying that particular gun. He did give Daniels a holster for it, as well as drive him to pick up the gun. He also went with Daniels to fire the gun after Daniels had purchased it.

On May 16, 1998, Garton went to work at a nearby gun show. Carole visited the show on the way home from a doctor's appointment and went home with Daniels. Later that afternoon, Garton received a message from Daniels saying, "All done, going home."

When Garton came home, Mann and Gordon were there. He asked where Carole was, but did not tell Mann to call the police because the Jeep had been stolen. He then discovered Carole's body. Seeing blood, he yelled for someone to call 911, tried to find her pulse, and began trying to resuscitate her. The police arrived and removed him from the house.

The day after the murder, Garton did not speak with Lynn or with Daniels. The next day, he received a call from Daniels. Although Daniels said he had "copped a plea of jealousy," Garton did not realize at the time that Daniels was confessing to having killed Carole. In the conversation, Garton assured Daniels

12

that he would receive the money Garton's fencing company owed him. He also told Daniels that he would speak with his dad and his older brother — whom he had previously called "the big boys" — to see what they thought of the situation.

### 3. Prosecution rebuttal evidence

The prosecution presented additional evidence in rebuttal, including the following: Garton and Carole traveled to Oregon in April 1998; during that visit, Garton met up with Lynn and the two had sex. During the same month, Garton ordered business cards from a local printing store for someone who went by "Patriot," and he later ordered a flier for Carole's memorial service from the same store. He also kept an April 27, 1998 receipt from Office Max, showing the purchase of a manila envelope, a pager, and a label maker, along with several other office supplies.

### 4. Defense surrebuttal evidence

The defense presented testimony from Lynn in response to the prosecution's evidence concerning the Gartons' April 1998 trip to Oregon. Lynn acknowledged she may have made contradictory statements about the trip; she had previously told detectives that she had not seen Garton in Oregon that month, and she had later told the prosecution a different story.

## B. Penalty phase

The prosecution's penalty phase evidence consisted of victim impact testimony from Carole's father, stepmother, and two brothers. The family members described Carole's personality and interests, as well as her excitement about becoming a parent. They described how they learned about Carole's death and how seriously her death had affected them as a family and as individuals.

The defense did not present evidence at the penalty phase. At the beginning of his closing argument, before discussing the existence of mitigating

13

factors and arguing in favor of a sentence of life without parole, Garton's counsel said he had "a message as counsel for Mr. Garton to deliver to" the jury. He pointed out Daniels's role in the crime, noted that Garton was incarcerated and found guilty, and concluded, "To Todd, life without family, freedom, or honor, has little value. You might as well kill him. He is neither asking nor he expects more than death from you [*sic*]."

## II. GUILT PHASE ISSUES

### A. Wedding ring ruling

Garton argues that the trial court erred when it denied his request to wear his wedding ring during trial. He contends this alleged error "violated . . . his right to present evidence in his defense, to be dressed in civilian attire in the jury's presence, and to a reliable guilt and penalty determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and his rights under article I, sections 7, 15, 16, and 17 of the California Constitution."

#### 1. Background

At a pretrial hearing, defense counsel requested that the court allow Garton to wear his wedding ring and a religious necklace during trial. The court found the request "problematic" and indicated that it would discuss the request with the bailiff. The prosecutor opposed the request for security reasons. The prosecutor also commented, "I see no benefit for him wearing [the wedding ring] . . . other than his attempt to try and persuade the jury that he has nothing to do with this murder, and that he's still bonded with his wife, whatever it is he's trying to convey subconsciously, or directly to the jury."

The court took issue with the non-security ground of opposition concerning the wedding ring: "I see the People's point with regards to the wedding band, and that is, that one could consider the wearing of that band to be an — in effect, a

14

form of communication . . . . The problem with that argument . . . is that if the Defendant wasn't in custody, I'm not sure there would be any way I could compel him to take off his wedding band, even though you may or may not ever get to ask him about why he's wearing it." But the court acknowledged security concerns as to both items and opined that the effort required to ensure that the necklace and ring did not enter the jail "may be more of a burden than a busy Deputy Marshal should have to undertake."

At a subsequent hearing, the trial judge said he had spoken with his marshal and summarized the reasons the jail does not generally allow jewelry to be worn by inmates: jewelry can be made into a weapon or used for barter, even if the original wearer does not so intend. The court also noted that Garton would be wearing a tie and belt at trial, and said that "[t]here [are] roughly at least a hundred opportunities for the busy Marshal to inadvertently miss one of the now four items, two of which are small and not readily visible, to be missed and find their way back to the jail." Defense counsel offered several options to ensure the marshals would not miss the jewelry; he suggested providing the marshals with a checklist or personally taking responsibility for the jewelry. Defense counsel argued, "[A]ny other defendant who is not in custody in this court . . . would obviously come in wearing a wedding ring, if that's their normal course. And so what we're now saying is that he is being deprived of the rights that any other person would have to correctly appear or make a normal appearance before a jury because of the no-bail situation . . . . And the fact that he does not have a wedding ring could well be interpreted by jurors as abandonment of his wife, in some sense or another." The court was not persuaded and said: "[C]ounsel, there are a great many married men who never have worn wedding rings. It would really shock me to think that any juror would start making negative assumptions about a man whose wife died roughly two years ago because he isn't currently wearing a ring,

15

never having any knowledge about whether he ever wore a ring." The court denied Garton's request. Garton challenges the court's ruling as to the wedding ring but not as to the religious necklace.

### 2. *Analysis of civilian attire claim*

We first address Garton's claim that the trial court's denial of his request to wear his wedding ring violated his state and federal constitutional rights to be tried in civilian attire.

The high court "has declared that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." (*Taylor v. Kentucky* (1978) 436 U.S. 478, 485.) In particular, "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." (*Estelle v. Williams* (1976) 425 U.S. 501, 512 (*Estelle*).)

Among the "substantial reasons for the rule that a criminal defendant is entitled to be tried in ordinary clothing[, f]oremost is the rationale that compelling a defendant to go to trial in jail clothing could impair the fundamental presumption of our system of criminal justice that the defendant is innocent until proved guilty beyond a reasonable doubt." (*People v. Taylor* (1982) 31 Cal.3d 488, 494 (*Taylor*).) " 'Jurors required by the presumption of innocence to accept the accused as a peer, an individual like themselves who is innocent until proved guilty, may well see in an accused garbed in prison attire an obviously guilty person to be recommitted by them to the place where his clothes clearly show he belongs.' " (*Ibid.*, citing *Estelle*, *supra*, 425 U.S. at pp. 518–519 (dis. opn. of Brennan, J.).) In such circumstances, a defendant may not be able to sufficiently

16

present his or her defense due to "the embarrassment associated with . . . wearing jail garb." (*Taylor*, at p. 495.) Further, requiring defendants held in custody to wear inmate attire can violate the principles of equal protection: "[C]ompelling the accused to stand trial in jail garb operates usually against only those who cannot post bail prior to trial." (*Estelle*, at p. 505; see *Taylor*, at p. 495.)

The trial court's denial of Garton's request to wear his wedding ring during trial does not raise the concerns above. The absence of a wedding ring does not "identif[y]" a defendant as a person in custody (*Estelle*, *supra*, 425 U.S. at p. 502), nor does it act as a "constant reminder of the accused's condition" that stems from "distinctive, identifiable attire" associating a defendant with jail or prison (*id.* at pp. 504–505).

Garton argues that even if his request did not implicate the due process and presumption of innocence rationales for civilian attire, "he was denied equal protection of the laws due solely to his custodial status." He argues that out-of-custody defendants may wear a wedding ring at trial and implies that there was no justification for Garton's inability to do so. It is true that an in-custody criminal defendant's compelled wearing of jail-associated attire "impinges on the tenets of equal protection" because it tends to affect those who cannot afford bail. (*Taylor*, *supra*, 31 Cal.3d at p. 495.) When a criminal defendant who cannot afford bail must appear at trial in jail attire, " '[h]e suffers a disadvantage as a result of his poverty [and o]ur traditions do not brook such disadvantage. [Citation.]' " (*Ibid.*) However, we need not resolve the merits of Garton's equal protection theory; any such violation was harmless because the absence of his wedding ring did not impermissibly remind the jury of Garton's custodial status.

17

### 3. Analysis of evidentiary claim

We next address Garton's claim that he was "entitled to wear his wedding ring to rebut evidence that he did not love his wife and child and to prove affirmatively that he did" during his testimony and while otherwise present at trial. Garton notes that the jury was instructed pursuant to CALJIC 2.20 that when evaluating witness testimony during trial, it "may consider . . . [t]he demeanor and manner of the witness while testifying." He argues that his wedding ring would have constituted a portion of his demeanor during his testimony and throughout his trial. He contends that the trial court's rejection of his request to wear the ring constituted an abuse of discretion under state evidentiary law and a violation of his constitutional right to present evidence. The Attorney General responds that "while jurors might have drawn certain inferences based on the presence or absence of a wedding ring on appellant's finger while he sat at the defense table, any such inferences would have been inappropriate because they were not based on evidence."

Garton is correct that a jury may consider a witness's demeanor while testifying in order to determine the witness's credibility. (Evid. Code, § 780.) Further, "[t]he witness'[s] demeanor . . . is always assumed to be in evidence." (3A Wigmore, Evidence (Chadbourn ed. 1970) § 946, p. 783; see *People v. Adams* (1993) 19 Cal.App.4th 412, 438, citing *Dyer v. MacDougall* (2d Cir. 1952) 201 F.2d 265, 269 ["a witness's ' "demeanor" — is a part of the evidence' "].) A witness's demeanor can include everything from facial expressions and hand gestures to tone and attire. (See Timony, *Demeanor Credibility* (2000) 49 Cath. U. L.Rev. 903, 907 ["Generally, demeanor includes the witness's dress, attitude, behavior, manner, tone of voice, grimaces, gestures, and appearance. In other words, demeanor includes 'all matters which "cold print does not preserve." ' "].) Although jewelry is not typically part of a witness's demeanor relevant to his or

18

her credibility, a wedding ring conveys specific meaning, and its presence or absence may be relevant to credibility determinations in some cases. The Attorney General is thus incorrect in arguing that a trial court's ruling that a witness cannot wear a wedding ring while testifying is never an evidentiary ruling.

But the trial court did not abuse its discretion in prohibiting Garton from wearing his wedding ring while testifying or during trial. " 'A trial court has "considerable discretion" in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.]' " (*People v. Jones* (2017) 3 Cal.5th 583, 609.) Here, the court reasonably weighed the security concerns of Garton wearing his wedding ring against the ring's slight probative value. We find no abuse of discretion under these circumstances.

Finally, we reject Garton's remaining constitutional arguments concerning the court's wedding ring ruling. "[T]he trial court's rulings did not completely preclude him from pursuing the defense that he was wrongly accused." (*People v. Masters* (2016) 62 Cal.4th 1019, 1079.) Nor did it prevent him from arguing that he could not have committed the murders because he loved his wife. Rather, the court permitted Garton to present a variety of evidence on the topic of his relationship with Carole; indeed, he testified to their relationship himself, as did several other defense witnesses. The court's ruling thus did not constitute a deprivation of Garton's constitutional right to present a complete defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 689–691; *Masters*, at p. 1079.) The court's ruling also did not inappropriately invade the province of the jury; its evidentiary ruling did not "undermine[] the sanctity of jury deliberations and invade[] the jurors' mental processes." (*People v. Nelson* (2016) 1 Cal.5th 513, 569; see *People v. Fuiava* (2012) 53 Cal.4th 622, 666 [a ruling that probative

19

value of certain evidence was substantially outweighed by undue consumption of time did not invade province of jury].)  Nor did the ruling violate Garton's right to reliable guilt and penalty determinations.  (See *People v. Gurule* (2002) 28 Cal.4th 557, 620 [rejecting argument that "routine" evidentiary ruling violated defendant's rights to a reliable penalty, due process, a fair trial, and confrontation].)

## B.  Trial security measures for investigating officers

Garton argues that the trial court violated his rights to due process, a fair trial, and to reliable guilt and penalty determinations by allowing the prosecution's investigating officers to bypass metal detectors while entering the courthouse in front of jury members.  He argues that the officers' security bypass was inherently prejudicial to Garton's right to the presumption of innocence and was not justified by a manifest need.

### 1. *Background*

After trial began, Garton's counsel expressed concern that two investigating officers had been bypassing security at the entrance to the courthouse.  He noted that the officers sat at the prosecution's table during trial and argued that their ability to enter the courthouse without being searched "[s]how[ed] a level of trust on that side of this courtroom that is not being accorded to us."  Noting that both officers were expected to testify for the prosecution, the defense argued that the security bypass "present[ed] an impermissible appearance of credibility to those officers, being allowed to pass through without the proper search."  The defense requested that "all participants in the trial that are sitting at counsel table . . . go through exactly the same entry procedure as everybody else."

The court found that the officers' security bypass was not improper or prejudicial.  Observing that the security checkpoint was put in place to screen for weapons, the court said that because the officers were permitted to carry weapons

20

in the courtroom (see § 171b, subd. (b)(2)(A)), there was no reason for officers to go through additional screening once they identified themselves to court security officers.  At the same time, it offered to advise the jury "as to the reasons for that treatment so that they don't get the impression which you thought they would get, that somehow these two officers and potential witnesses have some kind of special credibility."  Defense counsel declined, saying that "an admonition would do more harm than good, so we have to live with the lesser of two evils."

### 2.  *Analysis*

We reject Garton's claim because nothing in the record suggests the jurors were aware that the officers were permitted to bypass the metal detectors when entering the courthouse.  Without such evidence, Garton cannot show he was prejudiced by the procedure.  (*See People v. Stevens* (2009) 47 Cal.4th 625, 642 [holding that defendant's contention that he should not have been accompanied by an officer at the witness stand fails for failure to show any prejudice].)  Moreover, even if the jurors had seen the two investigating officers bypassing security at the entrance to the courthouse, the jurors were instructed with CALJIC 2.20 on the considerations relevant to evaluating witnesses.  These considerations emphasize the testimony of the witness on the stand.  We presume the jury followed the court's instructions and would not have considered the officers' ability to bypass weapons screening as lending them a false aura of credibility.  (*People v. Thompson* (2010) 49 Cal.4th 79, 138.)  The trial court reasonably concluded that because the officers were authorized to carry weapons under state law (§ 171b, subd. (b)(2)(A)), there was no reason to subject them to weapons screening at the entrance to the courthouse.  The court did not err in permitting the continued use of the security bypass.

21

## C.  Confrontation clause error

Garton contends that his constitutional right to confront the witnesses against him was violated during the testimony of Shasta County coroner Dr. Susan Comfort.  He argues that Comfort relied on testimonial statements made by another coroner who performed Carole's autopsy, violating *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  He argues that such error violated his right to reliable guilt and penalty determinations.

### 1.  Background

As a coroner for Shasta County, Dr. Harold Harrison performed an autopsy of Carole and her fetus, and authored a report in June 1998.  He retired and was succeeded by Comfort, who testified as a witness for the prosecution at Garton's trial.

Comfort testified that she relied on Harrison's autopsy report and associated diagrams, as well as photographs taken at the autopsy and the crime scene, in forming the opinions she conveyed during her testimony.  She also acknowledged reviewing an emergency medical technician's crime scene report and a ballistics report produced by an employee of the California Department of Justice.  The prosecutor then told Comfort, "What I'd like to do is go through with you Dr. Harrison's findings in the autopsy of Carole Anne Garton," and he sought to introduce several diagrams Comfort had prepared in anticipation of trial that Comfort testified "accurately reflect[ed] the findings of Dr. Harrison."  Garton's counsel objected to introduction of the diagrams, saying, "As I understand, what this witness is going to be doing is testifying entirely from hearsay.  So, we're going to object."  The court overruled the objection but noted, "[I]f Dr. Comfort's testimony is based on assumptions, such as an assumption of the accuracy of a diagram or anything else, [then] that needs to be established in her examination."  The court later warned the prosecution to avoid eliciting testimony from Comfort

22

concerning hearsay, including portions of Harrison's report upon which she did not rely in forming her opinions.

Comfort testified on the trajectories of the bullets that injured Carole and her fetus, observed that the fetus was approximately eight and a half months old and would have been viable, and concluded that gunshot wounds caused Carole's death. On cross-examination, she estimated that Carole would have died within 20 or 30 minutes of being shot. At no point did either party seek to introduce Harrison's autopsy report into evidence.

### 2. Analysis

The Attorney General contends that Garton forfeited his confrontation clause claim by objecting to Comfort's testimony only on hearsay grounds. "But because defendant's trial occurred before the decision in *Crawford*, he has not forfeited his *Crawford* challenge." (*People v. Clark* (2016) 63 Cal.4th 522, 563, citing *People v. Rangel* (2016) 62 Cal.4th 1192, 1215 [clarifying that "in a case tried before *Crawford*, a defendant does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial"].)

The confrontation clause of the Sixth Amendment to the federal Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford*, the high court held that this guarantee bars the introduction of testimonial out-of-court statements offered for their truth unless (1) there is a showing that the declarant is unavailable and either (2) the defendant had a prior opportunity to cross-examine the declarant or (3) the defendant has forfeited his right to object through his own wrongdoing. (*Crawford*, *supra*, 541 U.S. at pp. 54, 62.) In light of the unavailability requirement, we note that greater vigilance by courts in

23

requiring live witnesses to be called when available would help to avoid confrontation clause problems.

Garton argues that "Dr. Comfort did little more than convey Dr. Harrison's findings verbatim to the jury," i.e., that she "conveyed his testimony to the jury as a surrogate witness." Thus, the core of Garton's confrontation clause claim is that Comfort's testimony introduced out-of-court statements from the autopsy report to the jury. In this regard, Comfort's testimony may be grouped into three categories: (1) in-court statements and opinions premised explicitly on photographs and X-rays from the autopsy (e.g., "Referring back to the photograph, other things we can see here, is she's got this gun powder stippling pattern just like we saw on gunshot wounds number three and four"); (2) recitations of statements made by Harrison in the autopsy report; and (3) opinions relying generally on Harrison's autopsy report and photographs, but not identifying specific facts from Harrison's report or photographs (e.g., "[Comfort]: The cause of death was the result of multiple gunshot wounds. [Prosecutor]: And what do you base that opinion on? [Comfort]: After reviewing the autopsy report prepared by Dr. Harrison and also the photographs that were taken at the scene and at the autopsy"). Because there was no showing of Harrison's unavailability, the confrontation clause bars the admission of any part of Comfort's testimony that constitutes testimonial hearsay, unless an exception applies. We begin by analyzing whether any of the three categories of Comfort's testimony included hearsay.

The first category of Comfort's testimony, premised explicitly on photographs and X-rays, did not constitute hearsay. "It is clear that the admission of autopsy *photographs*, and competent testimony based on such photographs, does not violate the confrontation clause. Hearsay is defined as an out-of-court 'statement.' (Evid. Code, § 1200.) A statement is defined for this purpose as an

24

'oral or written verbal expression or . . . nonverbal conduct *of a person*' intended as a substitute for oral or written expression. (Evid. Code, § 225, italics added.) Only people can make hearsay statements; machines cannot. [Citation.]" (*People v. Leon* (2015) 61 Cal.4th 569, 603.)

The second category of statements, those made by Harrison in the autopsy report and related by Comfort, did communicate out-of-court statements to the jury because the autopsy report contained the out-of-court statements of Harrison. For example, Comfort supplied facts from Carole's autopsy of which she had no personal knowledge: "Page 2 [of the autopsy report] contains the external examination and under that, under the general description, Dr. Harrison states that the body measures five feet five inches in length and he estimates a weight of 200 pounds and that she is pregnant"; "And that wound, the trajectory of the pathway, which I was able to determine from reading Harrison's report, was that it perforated the uterus, the amnionic sack [*sic*] surrounding the fetus, then the bullet entered the head of the baby and then angled downwards"; "I did not see anything mentioned at all in Harrison's report, any other kinds of injuries other than gunshot wounds"; "According to Harrison, they recovered a deformed, large-caliber projectile and it was in the petrous bone." Because these facts were offered for their truth, they were hearsay. (*People v. Sanchez* (2016) 63 Cal.4th 665, 684 ["If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay."].)

As to the third category of Comfort's statements, her own opinions generally relying on the photographs did not communicate out-of-court statements because photographs are not statements. With respect to Comfort's testimony generally relying on the autopsy report, which does contain Harrison's written statements, we have held that an expert may rely on hearsay in forming an opinion

25

and may tell the jury in general terms that she did so. (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) If Comfort had related as true a statement by Harrison, then she would have communicated hearsay. But this category of Comfort's testimony did not directly convey any statements by Harrison, nor in context did her testimony implicitly do so. Comfort explained earlier in her testimony that in addition to Harrison's autopsy report, she reviewed Harrison's diagrams and all of the photographs, and that "based on [her] review of all those documents," she "reach[ed] the same conclusions in [her] mind" as Harrison. In light of her entire testimony, it is clear that Comfort was exercising her own independent judgment to arrive at her conclusions. In sum, this third category of Comfort's statements only conveyed to the jury in general terms that Comfort relied on the autopsy report and did not communicate hearsay to the jury.

Assuming that the hearsay from the second category of Comfort's statements was testimonial within the meaning of *Crawford*, we find that any confrontation clause error would have been harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) A relatively small portion of Comfort's testimony concerning the state of Carole's body — only five or six statements out of testimony spanning 30 transcript pages — was hearsay. More importantly, the state of Carole's body and the manner in which she died were not disputed at trial. The parties stipulated to the fact that Carole was shot from a very close range, Daniels testified that he shot Carole at that close range, and an emergency medical technician testified that he saw bullet wounds in Carole's body at the crime scene and authenticated photographs showing the same. During guilt phase closing arguments, Garton's counsel acknowledged, "[T]here is no issue in this case about how Carole Garton was shot. Norman did that, not Todd Garton. How he did it, that issue is not relevant here. [¶] The issue is whether Mr. Garton was involved to some extent in having Mr. Norman Daniels go and do it."

26

Garton argues that the inability to cross-examine Harrison prevented him from obtaining clarifying details about how the fetus died, which could have allowed him to contest his intent to kill the fetus and "present a less-aggravated view of the crime."  Garton claims that Comfort (1) was unable to tell from Harrison's autopsy report whether a red dot visible in an autopsy photograph "was an injury or possibly a little red mole," and (2) relied on Harrison's autopsy report to conclude that Carole's fetus died of a gunshot wound rather than as a necessary consequence of Carole's death.  But Garton does not explain how the red dot would have contradicted either the autopsy report's or Comfort's assessment of the fetus's cause of death.  And because Daniels (not Garton) shot Carole and her fetus, it is not clear how the fetus's exact cause of death would have cast doubt on Garton's intent to kill the fetus or would have otherwise presented a less aggravated view of his crime.  We thus conclude that Garton was not prejudiced by the introduction of Comfort's case-specific hearsay statements concerning the state of Carole's body and her cause of death.

## D.  Territorial jurisdiction over conspiracy charge

Garton contends that the trial court erred in finding that it had jurisdiction over the charge that he conspired to murder Dean in Oregon.  He relies on *People v. Buffum* (1953) 40 Cal.2d 709 (*Buffum*), which held that California courts have jurisdiction over conspiracies to commit out-of-state crimes only when the conspiratorial acts done in California independently constitute attempts to commit those crimes.

### 1.  Background

The prosecution introduced evidence at the guilt phase tending to show that Garton, while residing in Shasta County, spent over a year planning to murder Dean.  Gordon testified that Garton began talking with him about a plan to murder

27

Dean around January 1997. He further testified that Garton expected to receive life insurance proceeds from Dean's death and offered to share a portion of those proceeds with Gordon in exchange for assistance in planning and committing the murder. Daniels testified that Garton approached him with plans to kill Dean in October 1997 and offered him money in exchange for his help. Daniels and Gordon testified that Garton talked to each of them in 1997 about murdering Dean while Dean was on a business trip in San Francisco, though Garton later changed the plan to murder Dean at his workplace or home in Oregon. Lynn testified that sometime in 1997, Garton "mentioned the idea" that "he could — or knew people who could" kill Dean. She also said that after she found out Dean had cheated on her, she told Garton to kill Dean.

The prosecution introduced evidence that Daniels, Gordon, and Garton prepared to murder Dean in California between 1997 and early 1998. Throughout 1997, Garton and Gordon watched violent movies together as "training." Daniels testified he and Garton shopped for shoes, rain gear, and wool hats so they would blend in when in Oregon and that they test-fired a gun they anticipated using in the murder. Shortly before Daniels, Gordon, and Garton left for Oregon in February 1998, they met at the Moose Lodge in Anderson, California, to discuss details of the planned murder. Sometime in 1997, Lynn had mailed Garton pictures of Dean, as well as keys to her home and cars, and Garton discussed using those keys to enter Dean's home in case they were not able to kill him at his workplace.

Daniels and Gordon testified to other planning conduct that occurred outside of California before February 1998. They each said that Gordon and Garton traveled to Portland, Oregon, in October 1997 to "scout out" Dean's home and workplace. Gordon also said that on that first trip, he and Garton walked around the Noyeses' house and discussed entering through the back door. He remembered that Garton drew a picture of the home and that they drove by Dean's

28

workplace in downtown Portland. He testified that on a second trip to Oregon in January 1998, he and Garton met with Lynn in a hotel to discuss their plans to kill Dean and that they had brought guns and knives with them "to show Lynn that we were really going to do this."

Daniels said that on February 6, 1998, Garton picked Daniels up and took him back to Garton's house. The two loaded Garton's car with an assortment of guns, ammunition, and knives, as well as a homemade silencer, latex gloves, and two walkie-talkies. Gordon then met them at the house, and they left for Oregon shortly thereafter. Gordon and Daniels said the three of them drove off with the intent to kill Dean at his workplace in Portland the next morning.

The prosecution presented evidence that Garton, Daniels, and Gordon arrived in Gresham, Oregon, that evening and checked into a motel. After leaving their weapons in the motel room, they drove by the parking garage where they had planned to kill Dean the next morning. They went back to the motel, slept, and returned to the parking garage with their weapons on the morning of February 7, 1998. Dean never entered the parking garage that morning, and Garton, Daniels, and Gordon eventually decided to stay at a different hotel. That night, the three left the hotel with their weapons and parked at a business near the Noyeses' home. They each armed themselves and walked to the Noyeses' home, and Garton tried to open the front door with a key Lynn had previously mailed him. He could not open the door with the key, and the men ran back to their car.

Before trial, Garton moved to dismiss the charge that he conspired to murder Dean on the ground that the court lacked territorial jurisdiction over the conspiracy, arguing that Garton's actions in California were insufficient to constitute an attempt to commit murder. At a hearing on the issue, the defense argued that "there was a degree of preparation in California," but that an attempt could not begin until Garton arrived in Gresham, Oregon. The court denied the

motion, reasoning that "the Defendant and his crime partners engaged in sufficient California acts to go beyond mere preparation, considering, and in light of, the unequivocal, clear, expressed intent to commit the murder."

During trial, the defense requested an offer of proof hearing pursuant to Evidence Code section 402 concerning Daniels's testimony about the conspiracy to murder Dean, but the court denied the motion as untimely. The defense later raised a standing objection to "anything dealing with anything up in Oregon"; the court acknowledged the objection and indicated that counsel would have to renew it at a later time. The court again discussed the jurisdictional issue in the context of the defense's motion for entry of judgment on grounds of insufficient corroborating evidence of accomplice testimony, and it again rejected Garton's jurisdictional arguments. At the close of the guilt phase, the jury convicted Garton of all conspiracy counts, including the conspiracy to murder Dean.

### 2. *Analysis*

As noted, *Buffum* held that a California court has jurisdiction over a conspiracy to commit a crime in another state when "the acts done within the state are sufficient to amount to an attempt to commit a crime but not otherwise." (*Buffum*, *supra*, 40 Cal.2d at p. 716.) In *People v. Morante* (1999) 20 Cal.4th 403, 432–433, we overruled this jurisdictional rule prospectively, holding that "our courts do have jurisdiction to criminally prosecute a defendant both for in-state conspiracies to commit offenses out of state, and for in-state aiding and abetting of the commission of offenses out of state." (*Id.* at p. 409.) But the information charging Garton with conspiracy to murder Dean was filed in 1998, before we decided *Morante*, and thus both parties agree that *Buffum* governs this case. Therefore, in order to determine whether the trial court had jurisdiction over the charge that Garton conspired to commit murder in Oregon, we must determine

30

whether his acts within California's borders independently constituted an attempt to commit murder.

The act element of attempt is satisfied when "a direct but ineffectual act [has been] done toward [a crime's] commission." (§ 21a.) "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.' [Citations.]" (*People v. Watkins* (2012) 55 Cal.4th 999, 1021 (*Watkins*).) We recently summarized the boundaries of an attempt as follows: "For example, if a person decides to commit murder but does nothing more, he has committed no crime. If he buys a gun and plans the shooting, but does no more, he will not be guilty of attempt. But if he goes beyond preparation and planning and does an act sufficiently close to completing the crime, like rushing up to his intended victim with the gun drawn, that act may constitute an attempt to commit murder." (*People v. Johnson* (2013) 57 Cal.4th 250, 258 (*Johnson*).) The standard is not that attempt liability attaches when law enforcement may lawfully intercede for investigative or crime prevention purposes. (Cf. conc. & dis. opn. of Chin, J., *post*, at pp. 1, 20, 24.)

Because there was clear evidence of Garton's intent to murder Dean, we review his actions in California under the slight acts rule. "Although a definitive test has proved elusive, we have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' [Citations.]" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) "Indeed, where (as here) the crime involves concerted action — and hence a greater likelihood that the criminal objective will be accomplished [citation] — there is a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct. [Citation.]" (*Id.* at pp. 10–11.)

31

By the morning of February 6, 1998, Garton had planned the murder of Dean extensively. He had loaded his car with weapons and equipment, and he then drove away from his home toward the state line with accomplices with the intent to murder Dean in the Portland area the next day. But, as in many other attempt cases, " '[t]he line between mere preparation and conduct satisfying the act element of attempt . . . is difficult to determine; the problem "is a question of degree and depends upon the facts and circumstances of a particular case." ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1192 (*Hajek and Vo*), overruled on another ground in *People v. Rangel*, *supra*, 52 Cal.4th at p. 1216.) We conclude that on the facts here, Garton's actions within California were not sufficient to satisfy the act element of an attempted murder.

Our attempt jurisprudence calls for a pragmatic, case-specific approach; " 'the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.' [Citations.]" (*People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

One factor that our case law on attempted murder has recognized is the defendant's geographic proximity to the victim. For example, in *Hajek and Vo*, one defendant told a witness that he planned to kill a woman and her family, and later both defendants drove a stolen van to a place near the family's home, gained access to the home while wearing gloves and carrying a pellet gun, and held the members of the family hostage. (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1193.) We rejected the defendants' argument that "there was insufficient evidence of an act that went beyond mere preparation" under the slight acts rule, noting that "[a]t the point defendants entered the [victims'] residence and took [two family members] hostage, it can fairly be said they were ' " 'actually putting [their murderous] plan

32

into action.' " '[Citations.]" (*Id.* at p. 1194.) Likewise, in *People v. Morales* (1992) 5 Cal.App.4th 917 (*Morales*), a case we have cited with approval (*Johnson*, *supra*, 57 Cal.4th at p. 258, fn. 4; *Hajek and Vo*, at p. 1194), the Court of Appeal found substantial evidence supporting the defendant's attempted murder conviction under the slight acts rule where the defendant "not only threatened to get [the victim] twice, he went home, loaded his gun, drove to his victim's neighborhood, and finally hid in a position that would give him a clear shot at [the victim] if [the victim] left by the front door [of his home]." (*Morales*, at pp. 926–927).

Our cases reviewing the overt act requirement for other attempt crimes similarly find relevant the defendant's proximity to the planned crime scene and the intended victim. For example, in *People v. Anderson* (1934) 1 Cal.2d 687, 690 (*Anderson*), we found that the defendant committed sufficient acts to constitute an attempted robbery. We said, "Defendant's conduct in concealing the gun on his person and going to the general vicinity of the Curran theater with intent to commit robbery may, for present purposes, be classified as mere acts of preparation but when he 'walked in there [Curran Theater entrance] about two feet from the grill' and 'pulled out the gun' and 'was just going to put it up in the cage when it went off', we are satisfied that his conduct passed far beyond the preparatory stage and constituted direct and positive overt acts that would have reasonably tended toward the perpetration of the robbery." (*Ibid.*; see also *Watkins*, *supra*, 55 Cal.4th at pp. 1021–1024 [reviewing cases finding sufficient evidence of the overt act element of an attempted robbery].)

Unlike the defendants' actions in the cases above, Garton's actions in California did not occur in close proximity to the victim or to the anticipated site of the murder in the Portland area. While in California, Garton could not "enter" the murder scene (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1194), "hid[e] in a

position that would give him a clear shot" (*Morales*, *supra*, 5 Cal.App.4th at p. 927), or even "go[] to the general vicinity" of the planned murder scene (*Anderson*, *supra*, 1 Cal.2d at p. 690).

We have previously found sufficient evidence of attempted murder when a defendant was far away from his victim but had no further actions to take to complete the crimes. In *Decker*, we held that the trial court erred in dismissing an attempted murder charge stemming from the defendant's attempt to "aim at [his sister] an armed professional who had agreed to commit [her] murder." (*Decker*, *supra*, 41 Cal.4th at p. 9.) We noted that "[a]lthough Decker did not himself point a gun at his sister" (*ibid.*), he "had effectively done all that he needed to do to ensure that [the victims] be executed" (*id.* at p. 14). "Decker had secured an agreement with Holston [an undercover police detective] to murder [his sister] (and, if necessary, her friend Hermine); had provided Holston with all the information necessary to commit the crimes; had given Holston the $5,000 downpayment; and had understood that 'it's done' once Holston left with the money." (*Id.* at p. 9.) We explained: "The purpose of requiring an overt act is that until such act occurs, one is uncertain whether the intended design will be carried out. When, by reason of the defendant's conduct, the situation is 'without any equivocality,' and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt act. [Citations.] Here, the record supported at least a strong suspicion that Decker's intent to have his sister (and, if necessary, her friend) murdered was unambiguous and that he had commenced the commission of the crime by doing all that he needed to do to accomplish the murders." (*Decker*, *supra*, 41 Cal.4th at pp. 13–14.)

Garton did not arrange to murder his victim from afar; he planned to be an armed member of a group that would murder Dean in Oregon. Before reaching the state line, he had done some, but not all of the things that "he needed to do"

34

(*Decker*, *supra*, 41 Cal.4th at p. 14) to murder his intended victim. He had gathered weapons and other equipment, scouted possible crime scenes, prepared his accomplices, and started driving toward Oregon. But he had not arrived near the anticipated crime scene, sent his accomplices off to murder Dean without further assistance, or taken other action sufficient to accomplish Dean's murder from afar. We conclude that Garton's actions in California were insufficient to satisfy the overt act element.

The facts of *Buffum* itself are instructive. There, a surgeon and an accomplice were convicted of conspiring to perform abortions in violation of former section 274. (*Buffum*, *supra*, 40 Cal.2d at p. 714.) Although the surgeon refused to perform abortions in Southern California, he took the phone numbers of several women and told them they would receive a call or gave them a number to call. His accomplice then called the women or received a call from them, and arranged to transport them to and from Tijuana, Mexico, where they received abortions from a third party. (*Ibid.*) On these facts, we found that the two defendants' actions within California were "merely preparatory." (*Id.* at p. 718.) We noted that "[n]o case has been cited or found which holds that persons can be convicted of an attempt to commit abortions if they do no more within the state than make arrangements for transportation and then take women from California to Mexico for the purpose of performing abortions upon them in that country. . . . There is nothing in the [former] section [274] which indicates that transportation or arrangement therefor has a direct relation to the acts prohibited by the statute." (*Ibid.*)

Similarly here, Garton's actions in California included planning an out-of-state crime, preparing to commit that crime, and transporting himself and his accomplices out of the state to commit the crime there. Whereas the defendants in *Buffum* intended to act as accomplices to a third party who would commit the

35

relevant crime, Garton planned to commit murder himself. His actions within California — planning and driving away with guns and accomplices — were insufficient to amount to attempted murder. Moreover, Garton's actions in California on February 6, 1998 were temporally separated by one night from his actions in Oregon on the morning of February 7, 1998. This significant temporal gap between when Garton and his coconspirators embarked for Oregon and their arrival at the location where they planned to kill Dean shows that, at the moment defendant and his coconspirators entered into Oregon, the plot to kill Dean was not "in such progress that it [would] be consummated unless interrupted by circumstances independent of the will of the attempter . . . ." (*Buffum*, *supra*, 40 Cal.2d 709 at p. 718.)

The Attorney General contends that "[a]lthough more than 12 hours elapsed and about 400 miles were driven between appellant's departure from Shasta County on February [6] and the first attempt to kill Dean on February [7], those circumstances do not preclude a finding that acts in California constituted an attempt." He notes that "an act may constitute an attempt even if subsequent acts are undertaken before a crime is committed," especially in the context of clearly shown intent, and he argues that "[l]oading the equipment into his Jeep and heading north on I-5 were the first steps toward putting his plan into action."

A defendant need not take the penultimate action toward a crime to be guilty of attempt. For example, a defendant need not point a gun at an intended victim to be guilty of attempted murder; when a defendant has clearly shown murderous intent, arriving near an intended victim's home or work with a weapon and then waiting for the victim can be attempted murder. (*Morales*, *supra*, 5 Cal.App.4th at pp. 926–927.) Nor must a defendant be within sight of a victim; when a defendant has clearly shown murderous intent, unequivocally directing an accomplice to commit a murder can constitute attempted murder. (*Decker*, *supra*,

36

41 Cal.4th at p. 9.)  But our case law does not suggest that a defendant with clearly shown intent need only make preparations or start moving toward the intended victim to be guilty of attempted murder.  (See *People v. Miller* (1935) 2 Cal.2d 527, 529 [holding that the defendant coming within 200 yards of the intended victim with a loaded rifle "do[es] not constitute an attempt to commit murder"]; *Anderson*, *supra*, 1 Cal.2d at p. 690 ["Defendant's conduct in concealing the gun on his person and going to the general vicinity of the Curran theater with intent to commit robbery may, for present purposes, be classified as mere acts of preparation"]; cf. *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1194 [stating that "[a]t the point defendants entered the [victims'] residence and took [two family members] hostage, it can fairly be said they were actually putting [their murderous] plan into action," and implying that the point of attempt had not yet been reached when defendants began driving to the residence, even though they had weapons and planned to murder the family]; *People v. Dillon* (1983) 34 Cal.3d 441, 456 [finding attempted robbery of a marijuana field where defendants had armed and disguised themselves, set off for the field, "made their way past barricades posted with 'no trespassing' signs," "divided themselves into small groups, encircled the field," and laid in wait for their opportunity].)  To be sure, the evidence shows that *after* Garton left California, he apparently *did* commit overt acts sufficient to support an attempted murder conviction.  But *Buffum* does not permit us to consider these out-of-state acts for the purpose of territorial jurisdiction in California.

In sum, we hold that Garton's activities in California do not satisfy the overt act element of attempted murder, even considering the clear evidence of his intent to murder Dean.  Although we acknowledge that our dissenting colleagues would draw the line at a different place, we conclude that Garton's actions within California were not sufficient to support a conviction for attempted murder.

37

Accordingly, we reverse Garton's conviction for conspiracy to murder Dean Noyes for lack of territorial jurisdiction.

### E. CALJIC No. 8.69 instructional error

Garton contends that the trial court's use of CALJIC No. 8.69 allowed the jury to find him guilty of conspiracy to commit murder without finding that he had a specific intent to kill. He argues that the court's instructions reduced the prosecution's burden of proof by omitting an essential element of the offense charged and thus violated his right to due process.

#### 1. Background

Garton was charged with three counts of conspiracy to commit murder. Each charge of conspiracy involved more than two parties: the conspiracies to murder Carole and her fetus involved three conspirators, and the conspiracy to murder Dean involved four conspirators. At the close of trial, as to all three counts, the trial court instructed the jury with a variant of CALJIC No. 8.69. That instruction stated in relevant part:

"In order to prove this crime, each of the following elements must be proved:

"1. Two or more persons entered into an agreement to kill unlawfully another human being;

"2. *At least two of the persons* specifically intended to enter into an agreement with one or more other persons for that purpose;

"3. *At least two of the persons* to the agreement harbored express malice aforethought, namely a specific intent to kill unlawfully another human being; and

"4. An overt act was committed in this state by one or more of the persons who agreed and intended to commit murder."

38

After deliberation, the jury returned guilty verdicts for conspiracy to murder Carole, conspiracy to murder a human fetus, and conspiracy to murder Dean.

### 2. *Analysis*

" 'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy. [Citations.] A conspiracy requires (1) the intent to agree, and (2) the intent to commit the underlying substantive offense.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 870.) The default phrasing of CALJIC No. 8.69 reflects these elements of specific intent. The instruction specifies that, in order to prove conspiracy to murder, the prosecutor must prove that "*each* of the persons specifically intended to enter into an agreement with one or more other persons for that purpose" and that "*each* of the persons to the agreement harbored express malice aforethought, namely a specific intent to kill unlawfully another human being." (CALJIC No. 8.69, italics added.)

The parties agree that the trial court erred by instructing to the contrary. As they correctly note, the trial court should have provided instructions informing the jury that in order to prove that Garton committed conspiracy to commit murder, the prosecution needed to prove that *Garton* was one of the several conspirators who possessed a specific intent to agree and to kill. Instead, the trial court gave a variant of CALJIC No. 8.69 that is appropriate when a conspiracy involves the " 'feigned participation of a false coconspirator or government agent.' " (Use Note to CALJIC No. 8.69 (7th ed. 2003) p. 388.) Asking the jury to find specific intent for "at least two" conspirators in a conspiracy with more than two members, none of whom is feigning involvement, could potentially lead a jury to find an individual conspirator guilty without finding that he or she possessed a specific

39

intent to agree or to kill.  (See *People v. Petznick* (2003) 114 Cal.App.4th 663, 680–681 [same erroneous CALJIC No. 8.69 instruction "permitted the jury to find defendant guilty of conspiracy to commit murder without regard to whether or not he personally intended to kill so long as they found that at least two of the other participants harbored that intent"].)

We conclude that the instructional error was harmless under any standard as to the conspiracies to murder Carole and her fetus.  (Because we reverse Garton's conviction for conspiracy to murder Dean on jurisdictional grounds, we need not determine whether this error was harmless as to that conspiracy charge.)  In addition to convicting Garton of the first degree murders of Carole and her fetus, the jury found true two special circumstances related to those murders:  (1) that the murders were committed as multiple murders and (2) that the murders were committed for financial gain.  The jury was instructed with a version of CALJIC 8.80.1, which stated in relevant part:  "If you find that Mr. Garton was not the actual killer of a human being, you cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that Mr. Garton, *with the intent to kill*, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree."  (Italics added.)  Thus, in finding the special circumstances true, the jury necessarily found that Garton possessed a specific intent to kill Carole and her fetus.

Moreover, the jury necessarily found that Garton possessed a specific intent to enter into an agreement with another person to commit the murder.  At trial, no party argued that Garton was the actual killer of Carole and her fetus; all parties agreed that Daniels was the actual killer.  The prosecution's theory of Garton's involvement in the murder of Carole and her fetus was that Garton enlisted Daniels to commit the murder and provided Daniels with assistance and advice in carrying out the murder.  On the record here, the jury's conclusion that Garton,

"with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree" necessarily subsumed a finding that Garton intended to enter into an agreement with Daniels to kill Carole and her fetus. (See *People v. Calhoun* (1958) 50 Cal.2d 137, 144 [to show an agreement, "it is sufficient if [the conspirators] positively or tacitly come to a mutual understanding to accomplish the act and unlawful design"].) Accordingly, the court's instructional error was harmless.

### F. Corroboration of accomplice testimony

Garton contends the trial court erred in denying his motion for entry of judgment of acquittal. He argues that the testimony of his accomplices was not corroborated as required by section 1111 and that the remaining evidence was insufficient to tie him to each murder and conspiracy charge.

#### 1. Background

During the guilt phase, Lynn, Daniels, and Gordon testified extensively as to Garton's involvement in the conspiracies to murder Dean, Carole, and Carole's fetus. At the close of the prosecution's case, Garton argued that "the Prosecution's entire case rests upon the statements of the accomplices," but that his accomplices' testimony was insufficiently corroborated by evidence independently linking him to each count of conspiracy and murder. He moved for a judgment of acquittal on the ground of insufficient evidence pursuant to section 1118.8. The trial court denied that motion as to each count against him.

#### 2. Analysis

"Section 1111 serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547.) Section 1111

41

provides, as relevant here: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.)

We have explained that "for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that ' "without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime." ' [Citations.] 'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.' [Citations.] The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and ' "may be circumstantial or slight and entitled to little consideration when standing alone" ' [citation]." (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) Conversely, "an accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independently* of the accomplice's testimony." (*Id.* at p. 36.) And corroborating evidence "may not come from, or require ' "aid or assistance" ' from, the testimony of other accomplices or the accomplice himself." (*People v. Whalen* (2013) 56 Cal.4th 1, 55 (*Whalen*).)

Garton contends that the testimony of his accomplices Lynn, Daniels, and Gordon was uncorroborated as to each count against him. Because we reverse

42

Garton's conviction for conspiracy to murder Dean on jurisdictional grounds, and because Gordon testified only as to that conspiracy, we address only Lynn's and Daniels's testimony regarding the remaining conspiracy and murder convictions concerning the killing of Carole and her fetus.

During the guilt phase, Daniels testified in detail about the conspiracy and acts that led to Carole's death. According to Daniels, at the beginning of April 1998, Garton suggested that Daniels commit a murder for hire as part of an "assassination ring" he called The Company. Garton said he was a member of The Company and his code name was "Patriot," and gave Daniels a business card with the name Patriot on it. Daniels agreed to participate in the murder in exchange for money. After he agreed, Daniels and Garton purchased the pistol that was used to kill Carole, and they picked up the gun after the statutory waiting period on April 27, 1998. Later that night, Garton delivered a large manila envelope with a wax seal to Daniels at Daniels's home, which contained a pager, several news articles, and several photos of Carole with instructions to murder her within the next month written on the back. Between April 28 and May 16, 1998, the day of Carole's murder, Daniels received and responded to several e-mails from the address companyt@usa.net concerning the details of the murder. He also communicated with Lynn online and via phone and pager concerning the murder and discussed the time and location of the murder with Garton. On the day of the murder, Daniels drove Carole home from a gun show they had attended together and shot her in her bedroom. He then left the Gartons' home in their Jeep, left the car in a parking lot, went home with the murder weapon, and contacted Garton, Lynn, the companyt@usa.net address, and several acquaintances.

In her testimony, Lynn recounted a similar understanding of the conspiracy to kill Carole and what Garton called The Company. She said that Garton told her Daniels wanted to get involved in the organization and that Garton eventually

asked her to help Daniels carry out a killing for the organization. She described conversations she had with Daniels and Garton about the planned murder over the phone and computer, as well as communications with Daniels, Garton, and the companyt@usa.net address about the murder after it happened. She also described Garton's demeanor after the murder, as well as her relationship with Garton in the wake of Carole's murder. The day after Carole's memorial service, she accompanied Garton to his home to "get rid of" "something that was incriminating," and she went with Garton to throw a set of cassette tapes and what was later identified as a label maker into the Sacramento River.

Several pieces of independent evidence corroborated these accomplices' testimony. First, the prosecution presented evidence corroborating Daniels's account of Garton's involvement in the acquisition of the murder weapon. The owner of a local gun shop, who was a friend of Garton's, testified that Garton and Daniels came into his store on April 17 and April 27, 1998, to purchase the type of pistol used to kill Carole and that Garton gave Daniels money to pay for the weapon after the waiting period. The store owner identified a receipt from the store documenting the purchase, which was admitted into evidence.

Second, there was evidence corroborating Daniels's and Lynn's accounts of Garton's involvement in the conspiracy through what he called The Company. Portions of e-mails concerning the conspiracy sent to Daniels's e-mail address from the companyt@usa.net address were recovered from the hard drive of the Garton's computer.

Third, there was evidence corroborating the accomplices' accounts of Garton's involvement with the murder and conspiracy after the murder had been committed. The prosecution introduced records from Garton's pager indicating that on the day Carole was murdered, he received a page stating, "All done, going home," consistent with Daniels's description of the page he sent Garton. And

44

Garton's own statements made during a recorded call with Daniels on May 18, 1998 provided independent corroboration. After Daniels told Garton that he "copped a plea of jealousy" and asked if Garton could help him get a lawyer, Garton told Daniels, "I'm gonna get on the phone to the big boys and see what we can pull here." This statement is reasonably interpreted as a reference to The Company and its higher members, i.e., "the big boys." Later in the call, Garton said, "And you know you're still gonna get yours, I'll see that, I'll see whatever monies you had coming goes to your ah, goes to your kid or your family or something." This statement corroborated Lynn's and Daniels's account that Daniels anticipated he would receive money for murdering Carole.

In prior cases, we have found similar evidence sufficient to satisfy the corroboration requirement of section 1111. (See *Whalen*, *supra*, 56 Cal.4th at p. 56 [defendant's statement that could be interpreted as admitting his connection to the charged crimes is sufficient independent corroboration under section 1111]; *Romero and Self*, *supra*, 62 Cal.4th at pp. 34–35 [citing cases in which defendant's possession and purchase of the murder weapon were deemed sufficient corroboration].) As to Daniels's testimony, all of the evidence above, " ' "without aid from the accomplice's testimony, tend[ed] to connect the defendant with the crime." ' " (*Romero and Self*, at p. 37.) And as to Lynn's testimony, Garton's recorded statements to Daniels and statements made through the companyt@usa.net address were sufficient corroboration of her account of the conspiracy and murder. Accordingly, we hold that the trial court did not err in finding the testimony of Garton's accomplices sufficiently corroborated under section 1111.

### G. Cumulative guilt phase error

Garton contends that the cumulative effect of the errors at his trial rendered it fundamentally unfair and unreliable, requiring reversal of his convictions. We have determined or assumed that four claims of error have merit: the denial of Garton's request to wear his wedding ring, the improper admission of hearsay related to Carole Garton's autopsy, the incorrect usage of CALJIC 8.69's instructions on conspiracy, and the incorrect assertion of territorial jurisdiction over a charge that Garton conspired to murder Dean. We hold that "none of the errors, individually or cumulatively, ' "significantly influence[d] the fairness of defendant's trial or detrimentally affect[ed] the jury's determination of the appropriate penalty." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 139 (*Valdez*).) The instructional and evidentiary errors were minor, especially in light of other jury findings and the significant evidence of guilt, and they did not have "negative synergistic effect[s]." (*People v. Hill* (1998) 17 Cal.4th 800, 847.) As to the jurisdictional error, we find no spillover or "synergistic effect." (*Ibid.*) When commenting on Garton's jurisdictional argument during trial, the court correctly concluded that even if it had dismissed the conspiracy charge relating to the attempted murder of Dean, "all of the evidence relating to [the charge] would still be admissible as evidence under [Evidence Code section] 1101(b) because it would be evidence relating to motive, intent, [and] plan regarding the Carole Garton murder. And although these conspiracies are charged separately, they are clearly, by the evidence . . . interrelated with a common motivation and design. . . ." Under these circumstances, we find no cumulative error requiring reversal of Garton's convictions.

46

### A. Cumulative penalty phase error

Garton contends that the cumulative effect of the errors at his trial require reversal of the death judgment. We conclude beyond a reasonable doubt that "none of the errors, individually or cumulatively, ' ". . . detrimentally affect[ed] the jury's determination of the appropriate penalty." ' " (*Valdez*, *supra*, 32 Cal.4th at p. 139.)

The prosecution focused overwhelmingly on the murders of Carole and her fetus in the penalty phase argument. The prosecutor mentioned the conspiracy to murder Dean in one oblique phrase ("He's the one that pulled these three co-conspirators into this whole plot to kill, or attempt to kill") and in one direct sentence ("And we have proven the conspiracy to murder another person, that was Dean Noyes"). Otherwise, the prosecution focused the arguments exclusively on how the murders of Carole and her fetus warranted the death penalty.

Moreover, as noted, the court would still have allowed evidence of the conspiracy to murder Dean even if it had concluded that California courts lacked jurisdiction over that charge. Thus, even if that charge had been dismissed, the jury would have heard evidence of that conspiracy during the guilt phase and would have been able to consider it during the penalty phase. Thus, we find no cumulative error requiring reversal of the death judgment.

### B. Constitutionality of California's death penalty statute

Garton raises several constitutional challenges to California's death penalty scheme. We have rejected these claims before and decline to revisit our prior holdings, as follows:

Consideration of the circumstances of the crime during the penalty phase pursuant to section 190.3, factor (a), does not result in an arbitrary and capricious

application of the death penalty and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. (*People v. Winbush* (2017) 2 Cal.5th 402, 489 (*Winbush*); see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 [§ 190.3, factor (a) does not violate the Eighth Amendment and is not unconstitutionally vague].)

The jury need not make findings that aggravating factors were present, that they outweighed the mitigating factors, or the factors were substantial enough to warrant a judgment of death beyond a reasonable doubt under *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 530 U.S. 584, and *Cunningham v. California* (2007) 549 U.S. 270. (See *People v. Merriman* (2014) 60 Cal.4th 1, 106; *People v. Griffin* (2004) 33 Cal.4th 536, 594–595.) The federal Constitution does not require that the trial court instruct the jury that it must find death is the appropriate penalty, that it must find aggravating factors outweigh the mitigating factors beyond a reasonable doubt, or that there is no articulable standard of proof for its penalty determination. (*People v. Delgado* (2017) 2 Cal.5th 544; *People v. Doolin* (2009) 45 Cal.4th 390, 456; *People v. Dunkle* (2005) 36 Cal.4th 861, 939 ["the capital sentencing function is not susceptible of a burden of proof quantification"].) And "[j]urors need not make written findings in determining penalty." (*People v. Valdez* (2012) 55 Cal.4th 82, 180.)

The federal Constitution does not require the court to instruct the jury that the prosecution has the burden of persuasion regarding the existence of aggravating factors, the weight of aggravating versus mitigating factors, and the appropriateness of a death judgment. (*People v. Mendoza* (2016) 62 Cal.4th 856, 916; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136–1137.) In addition, the trial court need not instruct the jury that life without parole was presumed the appropriate sentence; "[t]here is no requirement jurors be instructed there is a

' " 'presumption of life' " ' or that they should presume life imprisonment without the possibility of parole is the appropriate sentence." (*People v. Parker* (2017) 2 Cal.5th 1184, 1233.)

The jury is not required to unanimously find that certain aggravating factors warrant the death penalty under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and the equal protection clause does not compel a different result. (*People v. Enraca* (2012) 53 Cal.4th 735, 769; *People v. Casares* (2016) 62 Cal.4th 808, 854.) The court is also not required to instruct the jury that it need not unanimously find particular facts in mitigation. (*People v. Cage* (2015) 62 Cal.4th 256, 293 (*Cage*).)

The court's use of CALJIC No. 8.88, which instructs that jurors must be "persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances" to warrant a death judgment, is not unconstitutionally vague, appropriately informs jurors, and does not violate the Eighth and Fourteenth Amendments to the federal Constitution. (*Id.*; *People v. Landry* (2016) 2 Cal.5th 52, 122–123; *People v. Williams* (2016) 1 Cal.5th 1166, 1204–1205.) "We again conclude that the instruction is 'not unconstitutional for failing to inform the jury that: (a) death must be the appropriate penalty, not just a warranted penalty [citation]; (b) [a sentence of life without the possibility of parole] is required, if it finds that the mitigating circumstances outweigh those in aggravation [citation] or that the aggravating circumstances do not outweigh those in mitigation [citation]; (c) [a sentence of life without the possibility of parole] may be imposed even if the aggravating circumstances outweigh those in mitigation [citation]; (d) neither party bears the burden of persuasion on the penalty determination [citation]." (*Landry*, at p. 122.)

The use of adjectives like "extreme" and "substantial" in the list of mitigating factors in section 190.3 does not act as a barrier to the jury's

consideration of mitigating evidence in violation of the federal Constitution. (*People v. McKinnon* (2011) 52 Cal.4th 610, 692; *People v. Avila* (2006) 38 Cal.4th 491, 614–615.)  The use of CALJIC No. 8.85, which does not identify which sentencing factors are aggravating, mitigating, or both, is not unconstitutional.  (*People v. Delgado*, *supra*, 2 Cal.5th at p. 592; *People v. Hillhouse* (2002) 27 Cal.4th 469, 509 ["The aggravating or mitigating nature of the factors is self-evident within the context of each case."].)

The federal Constitution does not require intercase proportionality review among capital cases.  (*Winbush*, *supra*, 2 Cal.5th at p. 490; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51.)  "California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently. [Citation.]"  (*People v. Sánchez* (2016) 63 Cal.4th 411, 488.)  California's use of the death penalty does not violate international law, the federal Constitution, or the Eighth Amendment's prohibition against cruel and unusual punishment in light of "evolving standards of decency."  (*Cage*, *supra*, 62 Cal.4th at p. 297; *People v. Zamudio* (2008) 43 Cal.4th 327, 373.)

## CONCLUSION

We reverse Garton's conviction for conspiracy to murder Dean Noyes and affirm the judgment in all other respects.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**

**CONCURRING AND DISSENTING OPINION BY CHIN, J.**

I disagree with the majority's conclusion that the trial court lacked jurisdiction to try defendant for conspiracy to murder Dean Noyes (Dean). The test that governs this issue here is whether defendant's acts in California constituted an attempt to murder Dean. Given the unequivocal evidence of defendant's intent to commit that murder, the actions defendant took in California on February 6, 1998, to carry out his plan — assembling the members of the team he had recruited to help him kill Dean; loading his car with the weapons, ammunition, disguises, and other equipment he had gathered to commit the murder; driving north with the team several hours to the California border and crossing into Oregon, where he intended to kill Dean in a matter of hours — were sufficient to establish an attempt to murder Dean. This conduct amply serves the purpose of the overt act requirement: ensuring that a defendant is not punished for a guilty mental state alone, by removing any uncertainty as to whether the intended design will be carried out. And holding that it is sufficient to support an attempted murder conviction would further the purpose of criminal attempt liability: protecting the public by encouraging police to intervene when they discover that a formulated and finalized plan to commit murder is actually underway. Had police known on February 6, 1998, that defendant, heavily armed and with paid accomplices, was on his way to carry out a murder he had carefully planned over the course of many months, it surely would have been appropriate for them to have intercepted him.

These underlying purposes should guide our application of the relevant precedents and inform our conclusion. The majority gives them insufficient attention in concluding that defendant's conduct in California cannot establish attempted murder. I therefore dissent from the majority's reversal of defendant's conviction for conspiracy to murder Dean. In all other respects, I concur in the majority's opinion.

**RELEVANT FACTS**

Defendant offered Dale Gordon and Norman Daniels money to assist in Dean's murder, and spent over a year planning with them and Dean's wife, Lynn Noyes (Lynn), to kill Dean in Oregon. As part of their planning, they shopped for clothing so they would blend in when they were in Oregon killing Dean; they obtained pictures of Dean, information about his typical daily whereabouts, and keys to his house and cars in the event they failed to kill him at his workplace; they went to Oregon in October 1997 to "scout out" Dean's home and workplace; they went to Oregon again in January 1998, met there with Lynn to discuss their murder plans, and showed her guns, knives, ammunition, handcuffs, and latex gloves to demonstrate they "were really going to do this"; and they had a final planning meeting in late January or early February 1998 in Anderson, California, at which they discussed killing Dean at his workplace or, as a backup, killing him at his home. Shortly after the final planning meeting, defendant called Daniels and told him that "it's on," "meaning that [they] were going up to Oregon" to kill Dean.

On February 6, 1998, defendant assembled the members of the murder team at his house. He called Gordon's place of employment and made up a story that enabled Gordon to "leave work as soon as possible." Defendant picked up Daniels and took him back to his house, where they loaded defendant's car with

2

several silencers, latex gloves, two walkie-talkies, disguises, as many as six guns, fully-loaded magazines, and knives. When Gordon arrived, the car was already loaded, and defendant was "getting upset" because he wanted to get to Oregon "as soon as possible." Shortly thereafter, they all left for Oregon intending to kill Dean at his workplace early the next morning. Defendant intended to do the killing himself; Daniels and Gordon went along for backup and to provide help, if defendant needed it. They drove to the California border — about 130 miles and nearly one-third of the total distance to their destination — and crossed into Oregon, arriving later that evening in Gresham, Oregon. At some point during the trip, defendant called Lynn and said he "was on his way up to Oregon for business" and that she "should know what he was referring to." Early the next morning, defendant went with Daniels and Gordon to a garage near Dean's office, where they intended to kill Dean. They waited there about three hours, but Dean never showed up. Unbeknownst to defendant, Lynn had changed her mind about wanting Dean killed, and had convinced Dean to drive to work on February 7 in a car she knew defendant would not be looking for and that would not fit into the garage where defendant was waiting to kill Dean.

## RELEVANT LEGAL PRINCIPLES

The majority correctly states many of the legal principles that apply in determining whether defendant's acts in California constituted an attempt to commit murder. "In general, before an attempt to commit a crime can be made out, some overt act *towards* its commission, other than a mere act of preparation *for* its commission, must be established." (*People v. Compton* (1899) 123 Cal. 403, 410.) The act must show that the defendant was " ' "putting his or her plan into action." ' " (Maj. opn., *ante*, at p. 31.) Formulating " 'a definitive test' " for applying this principle " 'has proved elusive' " (*ibid.*), because " ' "[t]he line

3

between mere preparation and conduct satisfying the act element of attempt . . . is difficult to determine; the problem 'is a question of degree and depends upon the facts and circumstances of a particular case' " ' " (*id.* at p. 32). Here, however, two fact-specific rules guide the inquiry. First, "[b]ecause there was clear evidence of [defendant's] intent to murder Dean," only " ' "slight acts in furtherance of the design will constitute an attempt." ' " (Maj. opn., *ante*, at p. 31.) Second, because "the crime involve[d] concerted action — and hence a greater likelihood that the criminal objective [would] be accomplished [citation] — there [was] a *greater* urgency for intervention by the state at an *earlier* stage in the course of [defendant's] conduct." (*Ibid.*)

In addition to these principles, which the majority correctly sets forth, our case law recognizes several others. For an act to constitute an attempt, "it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]. . . . ' "[I]t is sufficient if it is the first or some subsequent act directed towards [commission of the crime] after the preparations are made." ' [Citation.]" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) It is also sufficient if it "would lead a reasonable person to 'believe a crime is about to be consummated absent an intervening force.' " (*Id.* at p. 9.) In other words, if, by virtue of the act, " 'the actual transaction has commenced which would have ended in the crime if not interrupted, there is clearly an attempt to commit the crime.' " (*People v. Mason* (1896) 113 Cal. 76, 79.)

In applying these principles, it is crucial to keep in mind the purposes they were established to further: setting proper limits for criminal attempt liability while still serving the goal of criminal law " 'to protect society from those who intend to injure it.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 453 (*Dillon*).) " 'Applying criminal culpability to acts directly moving toward commission of

4

crime . . . is an obvious safeguard to society because it makes it unnecessary for police to wait before intervening until the actor has done the substantive evil sought to be prevented. It allows such criminal conduct to be stopped or intercepted when it becomes clear what the actor's intention is and when the acts done show that the perpetrator is actually putting his plan into action.' [Citations.]" (*Ibid.*) At the same time, "[t]o ensure that attempt principles do not punish a guilty mental state alone, an act toward the completion of the crime is required before an attempt will be recognized." (*People v. Johnson* (2013) 57 Cal.4th 250, 258 (*Johnson*).) "[U]ntil [an overt] act occurs, one is uncertain whether the intended design will be carried out." (*Decker*, *supra*, 41 Cal.4th at p. 13.) "It is that quality of being equivocal that must be lacking before the act becomes one which may be said to be a commencement of the commission of the crime, or an overt act, . . . and this is so for the reason that so long as the equivocal quality remains no one can say with certainty what the intent of the defendant is." (*Miller*, *supra*, 2 Cal.2d at pp. 531-532.)

These principles have given rise to the following additional rules and guidelines: "When, by reason of the defendant's conduct, the situation is 'without any equivocality,' and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt act." (*Decker*, *supra*, 41 Cal.4th at p. 13; see maj. opn., *ante*, at p. 34 [quoting *Decker*] .) "Public safety would be needlessly jeopardized if the police were required to refrain from interceding until absolutely certain in each case that the criminal would go through with his plan. The law of attempts eliminates precisely that burden once the subject has plainly demonstrated, by his actions, his intent presently to commit the crime." (*Dillon*, *supra*, 34 Cal.3d at p. 454.) Thus, as the majority explains, " ' "[w]henever the design of a person to commit crime is clearly shown, slight

5

acts in furtherance of the design will constitute an attempt." ' " (Maj. opn., *ante*, at p. 31.)

Consistent with the focus in the law of criminal attempts on the role of unequivocality, we have, notwithstanding our general statement as to the adequacy of preparatory acts, expressly acknowledged decisions from California and elsewhere holding that where "the preparation for the [crime] was without any equivocality, and the intent thus being proved, the preparation was sufficient to constitute the overt act." (*Miller*, *supra*, 2 Cal.2d at p. 532.) These decisions, we have explained, fall within a "class of cases where the acts of preparation themselves clearly indicate the certain unambiguous intent and suffice to constitute the attempt." (*Ibid.*; see also *Decker*, *supra*, 41 Cal.4th at p. 12 [" '*some* preparations may amount to an attempt' "].)

In short, as the majority observes, our decisions collectively establish "a pragmatic, case-specific approach" for determining when a criminal attempt has occurred. (Maj. opn., *ante*, at p. 32.) They also establish, as the majority notes, that in making this determination, " ' "courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime." ' " (*Ibid.*)

## DISCUSSION

Although the majority and I generally agree on the governing legal principles, I disagree with the majority's application of those principles and would hold that defendant's acts in California on February 6, 1998, were sufficient to support a conviction for the attempted murder of Dean. Defendant's acts in California on that date of assembling his murder team at his house, loading his car with the weapons and equipment he intended to use to kill Dean, setting off for

6

Oregon with Daniels and Gordon intending to kill Dean at his workplace the next morning, and driving several hours to the California border and crossing into Oregon toward his destination, clearly constituted far more than " ' "slight acts in furtherance of [his] design" ' " to murder Dean. (Maj. opn., *ante*, at p. 31.) Through this conduct, defendant was " ' "putting his or her plan into action" ' " (*ibid.*) and taking steps "directed towards [commission of the crime] *after the preparations* [*were*] *made*" ' " (*Decker*, *supra*, 41 Cal.4th at p. 8, italics added.) These acts "would [have led] a reasonable person to 'believe a crime [was] about to be consummated absent an intervening force' " (*id.* at p. 9), and showed that " 'the situation [was] "without any equivocality" ' " and that " 'the design [would] be carried out if not interrupted' " (maj. opn., *ante*, at p. 34). Indeed, defendant failed to complete the crime, not because he changed his mind, but because Lynn, having had a change of heart, "interven[ed]" (*Decker*, at p. 9) and "interrupted" (*id.* at p. 13) defendant's plan by convincing Dean to drive to work on February 7 in a car she knew defendant would not be looking for and that would not fit into the garage where defendant was waiting to commit the murder. Moreover, to the extent, if any, that defendant's acts in California may arguably be characterized as "preparation," under our case law, they "clearly indicate[d] the certain unambiguous intent," and therefore "suffice[d] to constitute the attempt." (*Miller*, *supra*, 2 Cal.2d at p. 532.)

Several of our prior decisions support these conclusions. In *People v. Mayen* (1922) 188 Cal. 237, 255 (*Mayen*), the defendant was convicted of attempted grand larceny, and asserted on appeal that the evidence was insufficient to sustain his conviction. We disagreed, citing the following evidence: The defendant, through a confederate, induced the intended victim to agree to contribute money towards a "framed up . . . stock gambling investment." (*Ibid.*) After the intended victim obtained the money, the defendant "asked" him "to turn

7

[it] over," but was arrested "before the payment was actually made." (*Id.* at p. 256.) On these facts, we held that the defendant's acts went "far beyond the point of mere preparation" and constituted an "actual attempt . . . to get possession of the money." (*Ibid.*) Most significantly for present purposes, we reached this conclusion even though the defendant was arrested "while the parties were on their way from Los Angeles to Oakland, where the deal was to be consummated." (*Ibid.*) *Mayen* thus supports the conclusion that, in this case, defendant committed attempted murder when, on February 6, 1998, he assembled Daniels and Gordon at his house, loaded his car with weapons and other necessary equipment, and drove north several hours "on [his] way from" his home in California to Oregon, "where the [murder plot] was to be consummated" in a matter of hours. (*Ibid.*)

In *People v. Stites* (1888) 75 Cal. 570, 570-571 (*Stites*), the defendant was convicted of attempting to place an obstruction upon a railroad track in San Francisco, and asserted on appeal that the evidence was insufficient to sustain his conviction. The evidence showed that on the day preceding his arrest, he and a confederate discussed " 'how they could most advantageously and effectively . . . place an explosive upon the track,' " and agreed to " 'meet' " early the next morning at the junction of Turk and Hyde streets in San Francisco " 'for the purpose of immediately proceeding to put in execution [their] project.' " (*Id.* at p. 572.) Later, the defendant prepared a " 'bomb' " using dynamite cartridges the confederate had given him. (*Id.* at p. 573.) The next morning, about 15 minutes before the time of the rendezvous, the defendant left his house with the bomb in his coat pocket, and started walking to the meeting spot. (*Ibid.*) While still " 'on his way to meet his confederate,' " he was intercepted and arrested by police. (*Ibid.*) On these facts, we held that " 'when the [defendant] left his house . . . and went to Turk Street pursuant to the antecedent arrangement between his confederate and himself, it amounted to an overt act done by him for the

8

purpose of effecting the crime intended, and was in law and fact a criminal attempt.' " (*Id.* at p. 576.) We explained that, although there is " 'a difference between the preparation antecedent to the offense and the actual attempt,' " " '*if the actual transaction has commenced which would have ended the crime if not interrupted, there is clearly an attempt to commit the crime.*' " (*Id.* at pp. 576-577.)

Consistent with *Stites*, I conclude in this case that "when [defendant] left his house" in California with Gordon, Daniels, and the weapons, ammunition, and equipment he had gathered to kill Dean, and he "went to" the California border and crossed into Oregon "pursuant to [his] antecedent arrangement" with "his confederate[s]," he committed "an overt act . . . for the purpose of effecting the crime intended," which "was in law and fact a criminal attempt." (*Stites*, *supra*, 75 Cal. at p. 576.) Based on those acts, it can " 'fairly be said' " (maj. opn., *ante*, at p. 32) that " '*the actual transaction ha[d] commenced which would have ended in the crime if not interrupted*' " (*Stites*, at pp. 576-577) by Lynn's change of heart and her resulting effort to divert Dean from the garage where defendant was waiting to commit the murder.

Supporting this conclusion is the Mississippi Supreme Court's decision in *Stokes v. State* (Miss. 1908) 46 So. 627 (*Stokes*), which, as we long ago explained, falls within the "class of cases where the acts of preparation themselves clearly indicate the certain unambiguous intent and suffice to constitute the attempt." (*Miller*, *supra*, 2 Cal.2d at p. 532.) *Stokes* involved facts strikingly similar to those now before us. The defendant there was convicted of attempting to murder the husband of a woman with whom he had "relations . . . of a very friendly nature," "both to get rid of" the husband and "to realize on certain policies of life insurance" that he "was carrying for the benefit of his wife." (*Stokes*, at p. 628.) The defendant hired someone to commit the killing as the husband returned home

9

from a lodge meeting. (*Ibid.*) On the night the killing was to occur, the defendant and the would-be assassin met at the woman's home, and then "proceeded" together "to the place where" the killing was to occur. (*Ibid.*) The defendant brought a loaded gun, and was arrested as he was handing it to the assassin, who had secretly informed the police of the defendant's plan. (*Ibid.*)

In finding that the defendant in *Stokes* had committed "an overt act" sufficient to sustain his conviction of attempted murder, the court explained: "[W]hen the facts show, in furtherance of the design, that a gun has been procured and loaded, and the party so procuring and loading the gun has armed himself *and started out on his mission to kill*, but is prevented from carrying out his design by such extraneous circumstance as that the party he intends to kill does not come to the point where he expected to carry out his design, . . . , he is clearly guilty of the attempt. When [the defendant] attempted to procure [a hired assassin] to perpetrate this crime, and in furtherance of this purpose took the gun, loaded it, *and started with him to the point where the killing was to occur*, the act was an act done tending to effect the commission of the crime . . . and was an attempt. In this stage it had proceeded beyond mere preparation or intent, and was an actual step taken towards the commission of the crime. If the jury believed, as they did believe, that *the starting out with the gun* was for the purpose of stationing [the hired assassin] at a point where he could do the killing and was in furtherance of the design to kill [the husband], this was an act done, and defendant was properly convicted. The public welfare and peace [are] better subserved, and the lives of citizens better protected, by the holding that these acts constitute criminal attempt, as in fact they do, than would any attempted refinement of the law which would result in a contrary view." (*Stokes*, 46 So. at pp. 628-629, italics added.) "[W]henever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt, and this court will not

10

destroy the practical and commonsense administration of the law with subtleties [sic] as to what constitutes preparation and what [constitutes] an act done toward the commission of a crime. Too many subtle distinctions have been drawn along these lines for practical purposes. Too many loopholes have been made whereby parties are enabled to escape punishment for that which is known to be criminal in its worse sense." (*Id.* at p. 629.)

Although more than a century has passed since *Stokes* was decided, just 11 years ago, we described it as " '[o]ne of the leading cases in the United States on attempt to commit a crime,' " we identified it as the source of California's "slight-acts rule," and we relied on it in applying that rule "to the crime of attempted murder." (*Decker*, *supra*, 41 Cal.4th at p. 10.) Consistent with *Stokes*, I conclude that defendant's acts in California on February 6, 1998, "in furtherance of" his purpose and plan to kill Dean — loading his car with weapons, ammunition, and other equipment, "start[ing] with" his hired accomplices "to the point where the killing was to occur," driving about 130 miles north and crossing the state line into Oregon — were "act[s] done tending to effect the commission of the crime" and constituted "an attempt." (*Stokes*, *supra*, 46 So. at p. 628.) With those acts, defendant had "started out on his mission to kill, but [was] prevented from carrying out his design by" the "extraneous circumstance" that Dean, having been persuaded by Lynn to drive a different car to work, did "not come to the point where [defendant] expected to carry out his design." (*Ibid.*)

In reaching its contrary conclusion, the majority asserts that defendant's acts in California "did not occur in close proximity," either geographic or temporal, to the planned crime scene, the intended victim, and defendant's further actions to commit the murder in Oregon on the morning of February 7. (Maj. opn., *ante*, at p. 33.) "While in California," the majority states, defendant "could not 'enter' the murder scene [citation], 'hid[e] in a position that would give him a

11

clear shot' [citation], or even 'go[] to the general vicinity' of the planned murder scene [citation]." (*Id.* at pp. 33-34.) Moreover, the majority concludes, the "night" that "separated" defendant's actions in California on February 6 from his actions in Oregon on the morning of February 7 constituted a "significant temporal gap" that "shows" that, when defendant entered Oregon, the plot to kill Dean "was not 'in such progress that it [would] be consummated unless interrupted by circumstances independent of the will of the attempter . . . .' " (*Id.* at p. 36.)

Given the considerable evidence of defendant's intent to kill Dean and the purposes of the overt act requirement and criminal attempt liability, the majority accords these temporal and geographic considerations too much weight. In *Stites*, *supra*, 75 Cal. at page 576, we quoted and adopted the lower court's observation that " 'in considering whether a particular act done amounts to an attempt in a criminal sense, the proximity or remoteness of the person or thing intended to be injured is generally an important element.' " However, we also noted the impossibility of " 'fram[ing] any universal definition' " of an " ' "attempt" ' " that would " 'precisely indicat[e] the lines of inclusion and exclusion' " and " 'be both positively and negatively accurate, when applied to the facts of a particular case.' " (*Id.* at p. 575.) And we consequently advised that " ' "the special facts" ' " of " ' "each case" ' " must be considered " ' "in determining whether or not a criminal attempt has been proven." ' " (*Id.* at p. 579.) We also emphasized that " '*if the actual transaction has commenced which would have ended the crime if not interrupted, there is clearly an attempt to commit the crime.*' " (*Id.* at pp. 576-577.)

Moreover, since *Stites*, we have (1) emphasized that "[w]hether acts done in contemplation of the commission of a crime are merely preparatory or whether they are instead sufficiently close to the consummation of the crime is a question of degree and depends upon the facts and circumstances of a particular case"

12

(*Decker*, *supra*, 41 Cal.4th at p. 14); (2) adopted the slight acts rule (*id.* at p. 8); (3) held that "the plainer the intent to commit the offense, the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement" (*Dillon*, *supra*, 34 Cal.3d at p. 455); (4) held that criminal attempt liability exists " 'when it becomes clear what the actor's intention is and when the acts done show that the perpetrator is actually putting his plan into action' " (*id.* at p. 453); and (5) stated that "where . . . the crime involves concerted action — and hence a greater likelihood that the criminal objective will be accomplished [citation] —there is a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct" (*Decker*, at pp. 10-11). Thus, while the geographic proximity of the intended victim *may*, depending on the facts, be "*an important element*" (*Stites*, *supra*, 75 Cal. at p. 576, italics added), it is not, under our case law, determinative. Notably, the majority cites no case holding that a defendant who was in the process of carrying out a finalized plan to commit a crime — by driving several hours with accomplices and the necessary weapons and equipment toward the location where the crime was to be committed — had not committed an attempt because he had not yet reached his destination.

On the contrary, the majority expressly recognizes that in *Decker*, we found that acts of a defendant committed "far away from his victim" constituted "sufficient evidence of attempted murder." (Maj. opn., *ante*, at p. 34.) In *Decker*, the defendant offered an undercover detective $35,000 to kill both the defendant's sister and, if necessary "to avoid having a witness," the sister's friend. (*Decker*, *supra*, 41 Cal.4th at p. 6.) The defendant provided descriptions of his sister, her mode of dress, her residence, her office, her car, and her daily habits. (*Ibid.*) The detective proposed committing the killing during a staged robbery or carjacking, and asked for a down payment. (*Ibid.*) Two days later, during a meeting at a golf course, the defendant gave the detective $5,000, promised to pay the balance when

13

the job was done, and reiterated that his sister's friend, if present, should be killed as well. (*Id.* at pp. 6-7.) The detective replied that he could get the job done quickly, and said, " 'once I leave here, it's done.' " (*Id.* at p. 7.) When asked if he was sure he wanted to go through with the murder, the defendant replied, " 'I am absolutely, positively, 100 percent sure," and urged the detective to commit the murder " 'as fast as you can.' " (*Ibid.*) The detective drove off, and the defendant was arrested a short time later. (*Ibid.*) Although, as the majority recognizes, the defendant's act in *Decker* of giving the detective a down payment occurred "far away from his victim" (maj. opn., *ante*, at p. 33), we held that with that act, the defendant "was ' "actually putting his plan into action" ' " for purposes of attempt liability (*Decker*, *supra*, 41 Cal.4th at p. 9). The defendant's acts, we explained, "would lead a reasonable person to 'believe a crime is about to be consummated absent an intervening force' — and thus that 'the attempt is underway.' [Citation.] . . . Although [the defendant] did not himself point a gun at his sister, he did aim at her an armed professional who had agreed to commit the murder." (*Ibid.*) A different result, we found, was not warranted by the fact that the defendant committed these acts "in a parking lot" rather than near "the victim's home." (*Id.* at p. 12, fn. 2.) This finding and our conclusion undermine the majority's conclusion here that defendant's acts in California were insufficient because they "did not occur in close [geographic] proximity to the victim or to the anticipated site of the murder." (Maj. opn., *ante*, at p. 33.)

Indeed, *Decker* also undermines the majority's conclusion that the "temporal gap" between defendant's acts in California and his arrival in Oregon precludes liability for attempted murder. (Maj. opn., *ante*, at p. 36.) When the defendant in *Decker* provided the down payment and promised to pay the balance upon the job's completion, the detective said "he was 'convinced' he would see the [sister] *the next day*, and that he could get this 'job' done quickly." (*Decker*,

14

*supra*, 41 Cal.4th at p. 7, italics added.)  Thus, we held in *Decker* that the defendant's act of making the down payment " ' "actually put[] his plan into action" ' " for purposes of attempt liability and "would lead a reasonable person to 'believe a crime is about to be consummated absent an intervening force' " (*id.* at p. 9), notwithstanding the defendant's understanding, belief, and expectation that the detective would commit the murder *the next day at the earliest*.  This holding refutes the majority's conclusion that the "night" that "separated" defendant's actions in California on February 6, 1998, from his actions in Oregon the next morning constituted a "significant temporal gap" establishing that when he entered Oregon, his plan to kill Dean "was not 'in such progress that it [would] be consummated unless interrupted by circumstances independent of the will of the attempter . . . .' " (Maj. opn., *ante*, at p. 36.)

In these respects, *Decker* is similar to our decision over a century ago in *People v. Botkin* (1901) 132 Cal. 231 (*Botkin*).  There, the defendant, in San Francisco, mailed a box of poisoned candy to a woman in Delaware, "with intent that" she would there eat the candy and die as a result.  (*Id.* at p. 232.)  We concluded that the defendant's acts in California — "[p]reparing and sending the poisoned candy to" the woman in Delaware — "coupled with a murderous intent, constituted an attempt to commit murder."  (*Id.* at p. 233.)  Thus, we found sufficient evidence of an attempt even though (1) the defendant's actions to implement her clear criminal intent "did not occur in close proximity to the victim or to the anticipated site of the murder" (maj. opn., *ante*, at p. 33), and (2) the "temporal gap between" those actions and the additional acts necessary for completion of the murder was, given the speed of the mail in the early 1900's, surely larger than the temporal gap between defendant's acts in California and his "arrival at the location where [he] planned to kill" Dean (*id.* at p. 36).

15

The majority's proximity analysis is also inconsistent with *Mayen*. As explained above, we there held that the defendant's acts went "*far beyond* the point of mere preparation" and constituted an "actual attempt . . . to get possession of the [intended victim's] money," even though the defendant was arrested "while the parties were on their way from Los Angeles to Oakland, where the deal was to be consummated." (*Mayen*, *supra*, 188 Cal. at p. 256, italics added.) Thus, we found sufficient evidence of an attempt even though (1) the defendant's actions to implement his clear criminal intent "did not occur in close proximity to . . . the anticipated site of the [crime]" (maj. opn., *ante*, at p. 33), and (2) the "temporal gap between" those actions and the additional acts necessary for the crime to be completed was, given the means of travel in the early 1900's, at least as large as, and likely larger than, the temporal gap between defendant's acts in California and his "arrival at the location where [he] planned to kill" Dean (*id.* at p. 36). Notwithstanding these factors, we held, quoting *Stites*, that " 'the actual transaction ha[d] commenced which would have ended in the crime if not interrupted,' " and that therefore, " 'there [was] clearly an attempt to commit the crime.' " (*Mayen*, at p. 256.)

Of these decisions, the majority mentions only *Decker*, but its effort to distinguish that decision is unpersuasive. Emphasizing *Decker*'s statement that the defendant there " 'had effectively done all that he needed to do to ensure that [the victims] be executed' " (maj. opn., *ante*, at p. 34), the majority observes that, because defendant in this case "planned to be an armed member of a group that would murder Dean in Oregon," his acts in California constituted only "some, but not all, of the things that 'he needed to do' [citation] to murder" Dean (*id.* at pp. 34-35). Contrary to the majority's analysis, in observing that the defendant in *Decker* had done "all that he needed to do" to accomplish his intended crimes (*Decker*, *supra*, 41 Cal.4th at p. 14), we were not establishing that as the test for

16

whether an attempt has occurred. Instead, we were simply describing the state of the evidence in the case, a state that was certainly *sufficient* to establish an attempt, but not *necessary*. Indeed, to read *Decker* as establishing that there is no attempt unless the defendant did *all* that he or she needed to do to accomplish the intended crimes, would be inconsistent with the following principles we stated in our opinion: (1) *slight* acts are enough when the intent to commit a crime is clearly shown (*id.* at p. 8); (2) the slight acts rule applies to an attempt to commit murder (*id.* at p. 10); and (3) "[f]or an attempt, the overt act . . . need not be the last proximate or ultimate step toward commission of the crime or crimes," but may be " ' "the first or some subsequent act directed towards that end after the preparations are made" ' " (*id.* at p. 8).

The majority's narrow reading of *Decker* is also inconsistent with several other aspects of that opinion. We explained there that, because " ' "all acts leading up to the ultimate consummation of a crime are by their very nature preparatory," ' " "[c]onduct that qualifies as mere preparation and conduct that qualifies as a direct but ineffectual act toward commission of the crime exist on a continuum," and "[t]he difference between them 'is a question of degree.' " (*Decker*, *supra*, 41 Cal.4th at p. 12.) We also explained that, in light of "[t]he purpose of requiring an overt act" — resolving "uncertain[ty]" as to "whether the intended design will be carried out" — "[w]hen, by reason of the defendant's conduct, the situation is 'without any equivocality,' and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt act." (*Id.* at p. 13; see maj. opn., *ante*, at p. 34 [quoting *Decker*].) We cautioned that "[w]here . . . the defendant's intent is unmistakable, ' "the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime." ' " (*Decker*, at p. 13.) We also emphasized

17

that "where . . . the crime involves concerted action — and hence a greater likelihood that the criminal objective will be accomplished [citation] —there is a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct. [Citation.]" (*Id.* at pp. 10-11; maj. opn., *ante*, at p. 31.)

The majority disregards these broad statements and principles in attempting to distinguish *Decker* based on defendant's decision "to be an armed member of a group that would murder Dean in Oregon" — rather than to "arrange to murder [Dean] from afar" — and his consequent failure, before crossing the state line into Oregon, to do "all . . . of the things that 'he needed to do' [citation] to murder" Dean. (Maj. opn., *ante*, at pp. 34-35.) In focusing on these facts, the majority fails to recognize that defendant's conduct in California amply fulfilled the "purpose of" the overt act requirement, by resolving "uncertain[ty]" as to whether defendant would carry out his "intended design," rendering "the situation . . . 'without any equivocality,' " and making "it appear[] the design [would] be carried out if not interrupted." (*Decker*, *supra*, 41 Cal.4th at p. 13.) It also fails to recognize the significance of the fact that this case "involve[d] concerted action," such that there was "a greater likelihood that the criminal objective [would] be accomplished" and "a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct. [Citation.]" (*Id.* at pp. 10-11.) In disregard of these crucial underlying considerations, it attempts to draw a sharp line, based on temporal and geographic proximity, between "[c]onduct that qualifies as mere preparation and conduct that qualifies as a direct but ineffectual act toward commission of the crime," instead of recognizing that such conduct "exist[s] on a continuum." (*Id.* at p. 12.)

Finally, the majority does precisely what *Decker* directs courts *not* to do: "destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the

18

commission of a crime." ' " (*Decker*, *supra*, 41 Cal.4th at p. 13.) According to the majority, had defendant, after assembling Gordon and Daniels at his house on February 6 and loading his car with the necessary weapons and equipment, simply stayed home and "sent his accomplices off to murder Dean without further assistance," he would, under *Decker*, have committed attempted murder. (Maj. opn., *ante*, at p. 35.) It defies common sense to hold, as does the majority, that defendant did not commit attempted murder simply because he decided instead to accompany his accomplices to Oregon and, to ensure that his plan was carried out, participate in the killing as "an armed member" of the murder team. (*Id.* at p. 34.) Certainly, in terms of the purpose of the overt act requirement, defendant's act of going to Oregon so he could personally commit the murder, instead of staying at home, did not make the situation more "equivocal" (*Miller*, *supra*, 2 Cal.2d at pp. 531-532) or increase the risk he would be punished for "a guilty mental state alone" (*Johnson*, *supra*, 57 Cal.4th at p. 258). On the contrary, that act, by "evidenc[ing]" defendant's " 'seriousness of purpose' " and bringing "the object of [his] contract" with Daniels and Gordon " 'closer to fruition,' " rendered the situation *less* equivocal, made it *more* apparent that "the design [would] be carried out if not interrupted" (*Decker*, at p. 13), and *decreased* the risk defendant would be punished solely for a guilty mental state.

Moreover, in terms of the purpose of imposing criminal liability for attempt — protecting the public — defendant's act of going to Oregon so he could ensure that Dean was killed *heightened* the need for police intervention. In *Decker*, *supra*, 41 Cal.4th at page 13, we said that "[i]t blinks reality to equate the threat posed by an individual who has merely invited another, perhaps unsuccessfully, to commit murder with the threat posed by an individual who has already reached an agreement with a hired killer to commit murder, finalized the plans, and made the [down payment] under the contract to kill." It likewise

19

"blinks reality" (*ibid.*) to conclude, as the majority apparently does, that the threat posed by someone who has reached an agreement with two hired killers to commit murder, finalized the plans, *and then set off with them to commit the crime*, is *less than* the threat posed by someone who instead stays home and "sen[ds] his accomplices off [by themselves] to murder" his intended victim. (Maj. opn., *ante*, at p. 35.) Because defendant's act in California of driving toward Oregon for several hours, heavily armed and with accomplices, made "clear that he was ' "actually putting his plan into action" ' " (*Decker*, at p. 9), it surely would have been appropriate for police in California to have " 'intercepted' " him as he made his way toward the border (*Dillon*, *supra*, 34 Cal.3d at p. 453). Indeed, police officers aware of that act, and of defendant's murderous intent, would clearly have been remiss in failing to do so. "The public welfare and peace [would be] better subserved, and the lives of citizens better protected, by [a] holding that these acts constitute criminal attempt," than by the majority's "attempted refinement of the law which . . . result[s] in a contrary view." (*Stokes*, *supra*, 46 So. at p. 629.)

Thus, by holding that defendant's decision to go to Oregon and participate in the killing actually *precludes* his conduct in California from constituting attempted murder, the majority, contrary to *Decker*, *supra*, 41 Cal.4th at page 13, " ' "destroy[s] the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime." ' " It also applies our precedents without consideration of the underlying purpose they were intended to serve: setting proper limits for criminal attempt liability — through the overt act requirement — while still protecting society from those who intend to injure it.

In addition to misreading *Decker*, the majority appears to misread the factual record in this case when it asserts that "our case law does not suggest that a defendant with clearly shown intent need only make preparations or start moving

20

toward the intended victim to be guilty of attempted murder." (Maj. opn., *ante*, at p. 37.)  According to the evidence at trial, defendant did not merely "make preparations or start moving toward [his] intended victim." (*Ibid.*)  Instead, after many months of elaborate "preparations" (*ibid.*), defendant, on February 6, 1998, assembled his hired accomplices at his house, loaded his car with the weapons and equipment he had gathered, "start[ed] moving toward [his] intended victim" in Oregon (*ibid.*), *and while still in California*, drove about 130 miles north to the California border and crossed into Oregon, thus completing almost one-third of his journey to the location where, in a matter of hours, he intended to kill Dean.  These acts "evidence[d] [defendant's] 'seriousness of purpose' and [brought] the object of [his] contract [with Gordon and Daniels] 'closer to fruition.' " (*Decker*, *supra*, 41 Cal.4th at p. 13.)  And in light of the compelling evidence of defendant's intent to kill Dean, they clearly constituted "direct movement[s] toward the commission [of the offense] after the preparations [were] made," and clearly "show[ed] that [defendant was] putting his . . . plan into action" (*id.* at p. 8), that "the situation [was] 'without any equivocality,' " and that his plan would have been "carried out" had it not been "interrupted" (*id.* at p. 13) by Lynn's successful effort to divert Dean to a different garage.  The majority's conclusion that, on the record here, this cannot even " 'fairly be said' " (maj. opn., *ante*, at p. 32) is difficult to understand.

In any event, contrary to the majority's statement, "our case law" does, in fact, "suggest" that where intent to commit a crime is "clearly shown," a defendant who "make[s] preparations" and "start[s] moving toward the intended victim" may "be guilty of attempted murder." (Maj. opn., *ante*, at p. 37.)  As explained above, *Stites*, *supra*, 75 Cal. 570, and *Mayen*, *supra*, 188 Cal. 237, both support this conclusion.  As I have also previously explained, so too does the Mississippi Supreme Court's decision in *Stokes*, which we have endorsed, followed, and

21

described as " '[o]ne of the leading cases in the United States on attempt to commit a crime' " (*Decker*, *supra*, 41 Cal.4th at p. 10).  Again, the majority discusses none of these decisions.

Moreover, of the decisions the majority cites in support of its statement, several actually support my conclusion.  The majority first cites *Miller*, but *Miller* was *not* a case in which the defendant's intent was "clearly shown."  (Maj. opn., *ante*, at p. 36.)  On the contrary, we there found the evidence of attempted murder insufficient precisely *because* "no one could say with certainty whether the defendant had come" armed with a gun "to kill" the person who had been annoying his wife "or merely to demand his arrest by the constable."  (*Miller*, *supra*, 2 Cal.2d at p. 532.)  In addition, it was in *Miller* that we (1) recognized a "class of cases where the acts of preparation themselves clearly indicate the certain unambiguous intent and suffice to constitute the attempt," and (2) included within that class *Stokes*'s holding "that, the intent being clear, the taking of a loaded gun and going in search of the intended victim constituted an attempt."  (*Miller*, at p. 532.)  In this regard, *Miller* clearly *does* "suggest" that, given defendant's "clearly shown intent" (maj. opn., *ante*, at p. 37), he committed attempted murder when, on February 6, 1998, he assembled his accomplices at his house, loaded a car with the weapons and other equipment he had collected, started off for Oregon, and drove for several hours before crossing the California border into Oregon, where he planned to kill Dean in a matter of hours.

*Dillon*, which the majority also cites (maj. opn., *ante,* at p. 37), likewise suggests that conclusion.  There, the defendant, while trying to take marijuana from a marijuana farm, shot and killed someone who was guarding the farm.  (*Dillon*, *supra*, 34 Cal.3d at pp. 451-452.)  We affirmed the defendant's conviction of attempted robbery even though the defendant never "actually encroach[ed] on the marijuana field," reasoning that, in light of "clear evidence of" his intent, the

22

jury could have "rationally" found that the following acts established he was engaged in an attempt to commit robbery: he and his accomplices armed and disguised themselves, set off for the farm, made their way past barricades posted with "no trespassing" signs, arrived on the scene carrying the means of forcibly subduing any opposition, divided themselves into small groups, encircled the field and watched for their opportunity, and persisted in their enterprise even after seeing armed guards. (*Id.* at p. 456.) However, in setting forth these facts, we were simply describing the evidence in the case, and were not, as the majority seems to be suggesting, establishing some factual threshold for attempt liability. This is clear from our discussion of the law governing liability for attempts, which explained: "Acts that could conceivably be consistent with innocent behavior may, in the eyes of those with knowledge of the actor's criminal design, be unequivocally and proximately connected to the commission of the crime; it follows that *the plainer the intent to commit the offense, the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement*." (*Id.* at p. 455, italics added.) These statements support the conclusion that, because defendant's intent to kill Dean could not have been "plainer," his acts in California on February 6, 1998, pursuant to his plan to kill Dean a few hours later in Oregon, "satisfy the overt act requirement." (*Ibid.*)

Other aspects of *Dillon* also support this conclusion. We there explained that "[p]ublic safety would be needlessly jeopardized if the police were required to refrain from interceding until absolutely certain in each case that the criminal would go through with his plan" (*Dillon*, *supra*, 34 Cal.3d at p. 454), and that "no public purpose is served by drawing fine distinctions" as to what is and is not an overt act where the evidence clearly shows that "the defendant intended to commit a crime *and was in the process of attempting to carry out that intent*" (*id.* at p. 453). In support of this discussion, we cited a federal decision stressing "the

23

importance of a rule" that "encourage[s] early police intervention where a suspect *is clearly bent on the commission of crime*" (*U.S. v. Stallworth* (2d Cir. 1976) 543 F.2d 1038, 1041, italics added), and "that enables society to punish malefactors who have *unequivocally set out upon a criminal course* without requiring law enforcement officers to delay until innocent bystanders are imperiled" (*id.* at p. 1040, italics added). (*Dillon*, at p. 453.) In light of these considerations, we explained, criminal liability for attempt attaches " 'when it becomes clear what the actor's intention is and when the acts done show that the perpetrator is actually putting his plan into action.' " (*Ibid.*) The evidence here is clear that defendant "intended to commit a crime" — killing Dean — and that, in driving to Oregon with accomplices, weapons, and other equipment, he was " 'actually putting his plan into action' " (*ibid.*), "was in the process of attempting to carry out [his] intent" (*ibid.*), was "clearly bent on the commission of crime" (*Stallworth*, at p. 1041), and had "unequivocally set out upon a criminal course" (*id.* at p. 1040). Thus, contrary to *Dillon*'s teachings, the majority's effort to "draw[] fine distinctions" as to what is and is not an overt act, and its conclusion that defendant needed to have gotten even closer to committing the murder, serve "no public purpose" (*Dillon*, at p. 453) and "needlessly jeopardize[]" public safety (*id.* at p. 454).

The other decisions the majority cites do not support its view. In *People v. Anderson* (1934) 1 Cal.2d 687, we rejected the defendant's argument that there was insufficient evidence of an overt act to establish attempted robbery, stating: "Defendant's conduct in concealing the gun on his person and going to the general vicinity of the Curran theater with intent to commit robbery *may, for present purposes,* be classified as mere acts of preparation but when he 'walked in there [Curran Theater entrance] about two feet from the grill' and 'pulled out the gun' and 'was just going to put it up in the cage when it went off', we are satisfied that

24

his conduct passed *far beyond* the preparatory stage and constituted direct and positive overt acts that would have reasonably tended toward the perpetration of the robbery." (*Id.* at p. 690, italics added.) It is clear from the italicized phrases in the preceding quote that we did not *hold* that the defendant's acts of "going to the general vicinity of the Curran theater" with a concealed gun *were* insufficient; rather, we assumed, for "purposes" of discussion, that those acts "*may* . . . be classified as mere acts of preparation," because the defendant had committed additional acts that went "*far beyond* the preparatory stage." (*Ibid.*, italics added.) Indeed, our conclusion that the defendant's additional acts went "*far beyond* the preparatory stage" (*ibid.*, italics added) actually supports the conclusion that the defendant had committed the requisite overt act *well before* committing all of those additional acts.

Finally, in *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1194, in rejecting the defendants' argument that there was insufficient evidence of an overt act to establish attempted murder, we stated: "At the point defendants entered the Wang residence and took Alice and Su Hung hostage, it can fairly be said they were ' " 'actually putting [their murderous] plan into action.' " ' " According to the majority, this statement "impl[ies] that the point of attempt had not yet been reached when [the] defendants began driving to the residence, even though they had weapons and planned to murder the family." (Maj. opn., *ante*, at p. 37.) In my view, it implies no such thing. Rather, it is yet another example of a court addressing the state of the evidence. Our conclusion that, on the evidence we cited, it could "fairly be said" the defendants were putting their plan into action, does not imply, let alone establish, that the same could not also "fairly be said" at some earlier point. (*Hajek and Vo*, at p. 1194.)

As we have "repeatedly" acknowledged, "the line between mere preparation and conduct satisfying the act element of attempt often is difficult to

determine; the problem 'is a question of degree and depends upon the facts and circumstances of a particular case.' [Citation.]" (*Watkins*, *supra*, 55 Cal.4th at p. 1021.) Here, consistent with *Decker*, I conclude that "in light of [defendant's] clearly expressed intent" (*Decker*, *supra*, 41 Cal.4th at pp. 8-9) to kill Dean, "[t]he purpose of requiring an overt act" (*id.* at p. 13), the goal of protecting the public, and the "*greater* urgency" for "*earlier*" police "intervention" created by defendant's "concerted action" with Daniels and Gordon (*id.* at pp. 10-11), defendant's acts in California on February 6, 1998, were "sufficient . . . under the slight-acts rule to hold him to answer to the charge[] of attempted murder" (*id.* at p. 9). I dissent from the majority's contrary conclusion, and its consequent holding that the trial court lacked jurisdiction to try defendant for conspiracy to murder Dean.

**CHIN, J.**

**WE CONCUR:**

**CUÉLLAR, J.**
**POOCHIGIAN, J.***

_____

* Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Garton

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.**S097558
**Date Filed:** March 5, 2018

_____

**Court:** Superior
**County:** Shasta
**Judge:** Bradley L. Boeckman

_____

**Counsel:**

Jeffrey J. Gale, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes, Sean M. McCoy and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeffrey J. Gale
111 Bank Street, #303
Grass Valley, CA  95945-6518
(530) 320-2777

Daniel B. Bernstein
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5171