Filed 4/13/23  In re Jacob Z. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re JACOB Z., a Person Coming Under the Juvenile Court Law. | B314600 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JACOB Z.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. FJ56856) |

APPEAL from an order of wardship of the Superior Court of Los Angeles County.  Robert J. Totten, Juvenile Court Referee. Affirmed.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Jacob Z. appeals from the adjudication of the juvenile court finding true the allegation he committed murder and declaring him a ward of the court pursuant to Welfare and Institutions Code section 602. Jacob contends the adjudication must be reversed, arguing the court committed evidentiary error by admitting hearsay gang evidence, the prosecutor committed error during closing argument by arguing facts outside the record, and cumulative error. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In December 2019, Jacob was 15 years old. He had been a member of a tagging crew and was recently associating with a criminal street gang called Varrio Nuevo Estrada (VNE). He convinced 13-year-old M.C. to lure Christian Medrano to the train tracks underneath the Cesar Chavez Avenue bridge on the afternoon of December 5, 2019. When M.C. and Medrano arrived at the appointed time, Jacob fatally shot Medrano in the head and then fled the scene with M.C.

The People filed a petition pursuant to Welfare and Institutions Code section 602 alleging Jacob had murdered Medrano (Pen. Code, § 187, subd. (a)).

The adjudication hearing began June 29, 2021, and lasted several days. M.C. testified pursuant to an immunity agreement with the prosecution in which she agreed to admit to a charge of conspiracy to commit murder, in exchange for a suitable placement, so long as she testified truthfully about the events surrounding Medrano's murder.

M.C. described how events involving Jacob, Jacob's girlfriend Julie, Medrano, and M.F. (the older brother of a friend from school) led to Medrano's murder. M.C. first met Medrano in the summer of 2019, a few months before his murder. He was in

a tagging crew called Eagle Block Street. They texted each other and sometimes got together to smoke pot. She was close friends with M.F. Between June and November 2019, M.C. and M.F. talked a lot and became "close." M.F. sometimes carried a gun and was in a tagging crew called In Toxic Criminals. M.C. only knew Jacob through Julie, his girlfriend at the time. Julie went to M.C.'s school, but they were not friends as Julie did not like M.C.

M.C. saw a lot of photographs of Jacob on Julie's Instagram account. Jacob went by the name Smokey. M.C. believed Jacob was in the gang called VNE because in a lot of the Instagram photos, Jacob was throwing VNE hand signs and he appeared to have a VNE tattoo on his hand. M.C. did not know if the VNE on Jacob's hand was a real tattoo or drawn with a pen.

She explained that sometime in November 2019, M.F. asked her to meet him at the park. When she arrived, M.F. asked her if she knew Medrano, using Medrano's "street" name of Exclusive. She said she did. At that point, she felt something cold and metallic on the back of her neck. She tried to turn around, but someone pushed her head to face forward. However, she was able to briefly see that it was Jacob behind her, and he had a gun to her head. Jacob then showed her a picture on his cell phone of her mother and little sister walking to school. He told M.C. he would hurt them if she did not do what he told her to do. Jacob told her to lure Medrano to the train tracks under the Cesar Chavez Avenue bridge at 3:00 p.m. on December 5, 2019.

Jacob told M.C. that, afterward, she should tell anyone who asked, including the police, that she went with Medrano to the park, but he seemed "out of it" so she left to go home at 3:00 p.m.

and that was the last time she saw him.  M.C. was frightened and nodded her head to indicate she would do what Jacob told her.

M.C. said that sometime after that, Julie told her that she better do what Jacob said or she was going "to get fucked up." Jacob texted her a map of the meeting place.

A few days later, M.C. told Medrano what happened and that it was going to be "a set-up," but he still agreed to go with her on December 5, 2019.  He showed her that he had a knife in his backpack.  When they were on the train heading to the meeting, M.C. saw Julie on the train watching them.

M.C. and Medrano got off the train and walked to the location that Jacob had texted to her.  Jacob stepped out from behind a pillar and pulled a handgun from his waistband.  He initially pointed the gun at M.C. but then turned it on Medrano and fired three times.  M.C. did not want to leave Medrano, but Jacob pointed the gun at her again and told her to pick up the backpack and come with him.  They ran down the train tracks and then got into an Uber car that was waiting at the curb.  M.C. was not sure who ordered the Uber to pick them up.  M.C. started to cry, and Jacob kicked her and told her to be quiet.  Jacob told the driver to drop M.C. at a McDonald's, and he left in the car with Medrano's backpack.

M.C. said she initially stuck to the story that Jacob told her to say, but she felt the police did not believe her.  When her mother asked her what was going on, she told her mother that M.F. shot Medrano because she was scared to say it was Jacob. Eventually, in a later police interview, she admitted to the police that it was Jacob after they told her they had photographs and surveillance video.

Detective Tommy Thompson of the Los Angeles Police Department testified about the investigation of the shooting. In 2019, he had over 18 years of experience as a homicide detective. He discussed the investigation of the shooting, including the recovery of surveillance video and documentation from numerous social media accounts. A search of Jacob's house resulted in the recovery of one of his cell phones. The phone contained photographs of Jacob holding a handgun, throwing gang signs, and making reference to killing two people and to the bulletin that had been posted in the neighborhood after the shooting. Text messages to and from Jacob's phone included a discussion about Medrano and that people were "telling" on him, and Jacob saying that Medrano was not "innocent" because he had shot at Jacob and his crew in the past.

Officer Aaron Gruendyke testified as a gang expert regarding VNE and the White Fence gang. Officer Gruendyke opined that Jacob was a member of VNE with the gang moniker of Smokey. He personally detained Jacob on two separate occasions, and both times he was in known VNE territory (including a street called "B Block" where several VNE members lived), and he was with known VNE gang members at the time. Officer Gruendyke said he was told by several unnamed VNE gang members that Jacob was in the gang. Jacob's counsel objected to the testimony, citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).) The objection was overruled.

Officer Gruendyke identified Jacob in a photograph of Jacob making the customary VNE hand sign ("two up and two down"). He explained that "throwing" gang hand signs generally connotes membership because gang members will ordinarily

assault, even kill, someone flashing their sign if the person is not an actual member.

After closing arguments, the court found the petition true and declared Jacob a ward of the court. In explaining its ruling, the court said it found M.C.'s testimony attempting to minimize her involvement in the murder to be "childish" and not completely believable. However, the court explained that her inability to accept her role in the murder did not cause the court to otherwise disbelieve her testimony regarding how the murder occurred. The court said it paid close attention to M.C.'s testimony. "I watched her demeanor and her emotion. I listened very intently. And the court concludes that what she indicated was that Jacob committed the crime, committed the murder. I have no doubt about that."

At the dispositional hearing, the court committed Jacob to a secure youth treatment facility for a maximum period of 25 years to life. The court awarded Jacob 575 days of predisposition credits.

This appeal followed.

## DISCUSSION

### 1.     The Gang Evidence

Jacob argues the court should have excluded Officer Gruendyke's opinion he was a gang member because it was "grounded on hearsay" statements from unnamed gang members who said Jacob was a member of VNE. He says the court prejudicially erred in overruling his *Sanchez* objection and admitting the testimonial hearsay. He argues the evidentiary error was prejudicial because the gang evidence was offered as the only motive for the murder, and there was otherwise no evidence of any interaction or relationship between Jacob and the

victim.  We find no error in the admission of the testimony over Jacob's objection, as it was neither inadmissible hearsay nor the only evidence of Jacob's gang membership or the gang motive for Jacob murdering Medrano.

In *Sanchez*, *supra*, 63 Cal.4th at page 686, the Supreme Court held that an expert may not "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  Case-specific facts are those facts "relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.)

Officer Gruendyke testified to facts based on his own personal knowledge that supported his opinion Jacob was a member of VNE.  Officer Gruendyke had twice detained Jacob in VNE territory in the company of VNE gang members.

Officer Gruendyke also testified he reviewed photographs of Jacob throwing the VNE hand sign.  Photographs are not hearsay.  (Evid. Code, § 1200; *People v. Garton* (2018) 4 Cal.5th 485, 506.)  Officer Gruendyke testified, based on his experience and expertise in gang behavior, that it was generally accepted that someone throwing a gang hand sign and posting pictures doing so indicates gang membership.  Nothing in *Sanchez* prevented Officer Gruendyke from relying on photographs in forming his opinion that Jacob was a member of VNE. (*Garton*, at pp. 506–507 [concluding expert could relay opinions based on review of autopsy photographs].)

Moreover, Officer Gruendyke was not the only witness whose testimony demonstrated Jacob's gang membership or provided a gang motive for the murder.  Two other witnesses provided evidence of Jacob's gang membership.  M.C. testified she

knew Jacob used the nickname Smokey and that he was a VNE gang member. She said he and his girlfriend regularly posted pictures of him on social media throwing the VNE hand sign and he had VNE written or tattooed on his hand. Detective Thompson also testified to numerous photographs on social media obtained during the investigation that showed Jacob holding a gun and throwing VNE hand signs.

In light of Officer Gruendyke's testimony and M.C.'s testimony, which was based on facts within their personal knowledge, the admission of the statements of unidentified gang members to show Jacob's gang membership was harmless, assuming it was error.

## 2.     The Prosecutor's Argument

Jacob next contends the prosecutor committed misconduct during closing argument by arguing facts outside the record. Toward the end of the rebuttal portion of the prosecutor's argument, the court interrupted to ask counsel to address the fact that M.F.'s account was used to arrange for the Uber driver and the defense argument that that evidence showed it was more likely that M.F. was the shooter and not Jacob. The prosecutor responded, saying "People can call Uber[] for other people. You don't have to have an account. . . . [T]hat doesn't mean the person who actually got into the car was [M.F.]." The prosecutor continued, "Messages could have been sent . . . . We know [Jacob] had at [least] three different phones. . . . [¶] . . . [¶] . . . The issue is who got into the Uber. It's not who made arrangements back at the park." Jacob says the prosecutor was testifying instead of arguing evidence in the record because there was no witness who testified to these alleged facts. He argues the improper argument was highly prejudicial because it tried to

explain away the defense theory that M.F. had actually been the shooter and it was more reasonable he ordered the Uber ride for himself to flee the scene.

It is undisputed Jacob did not object to the statements he now contends constitute improper argument. It is well settled that a timely and specific objection at trial "is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; accord, *People v. Huggins* (2006) 38 Cal.4th 175, 205 (*Huggins*).) Jacob has therefore forfeited the contention on appeal.

Jacob argues in the alternative that if his contention is forfeited, then his trial counsel was ineffective for failing to object. Jacob's burden to establish ineffective assistance on direct appeal is significant. Jacob must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–696.) Moreover, an attorney's failure to object rarely constitutes ineffective assistance. (*Huggins*, *supra*, 38 Cal.4th at p. 206.) And where, as here, the record on appeal does not show why counsel failed to object, " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*Ibid*.) Jacob has not satisfied this standard.

In any event, the record does not show misconduct. Detective Thompson, an experienced homicide detective, testified it was not unusual for an investigation to show that another

person ordered or arranged an Uber ride for someone else and that based on the overall investigation, he was "confident" Jacob was the individual responsible for the shooting. He believed it was possible that someone else ordered the Uber ride to pick up Jacob and M.C. using M.F.'s account. The prosecutor's responses to the court's questions were therefore based on reasonable inferences from this evidence.

## 3.    Cumulative Error

Finally, Jacob says the improper admission of gang evidence from Officer Gruendyke and the prosecutor's misconduct during closing combined to deprive him of due process and a fair trial. Since we find no error, we find no basis for cumulative error.

### DISPOSITION

The order of wardship is affirmed.

GRIMES, J.

WE CONCUR:

STRATTON, P. J.

VIRAMONTES, J.

10